ROBERT E. GILLESPIE AND DOROTHY B. GILLESPIE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3210–67, 6468–67.    Filed May 18, 1970.

*Paul 'L' Roy O'Connor* and *J. Elliott Busey*, for the petitioners.
*Joseph M. Wetzel*, for the respondent.

1028

**OPINION**

The petitioners owned or controlled all of the stock of Gillespie Equipment, Inc. That corporation obtained a loan of $60,000 from Trans-America Equity for which it issued $60,000 face amount of convertible debentures, secured by the guaranty of the petitioners to the extent of the value of certain collateral. The collateral consisted of all of the stock of Gillespie Decals, Inc., all of the stock of Gillespie Properties, Inc., all of the stock of Gillespie Equipment, Inc., and a second mortgage on certain real property owned by the petitioners. The value of the collateral was substantially in excess of $60,000.

When Gillespie Equipment, Inc., went into receivership, the debentures were in default. It was incumbent on the petitioners either to satisfy the indebtedness or to risk the loss of the collateral. After some negotiation, petitioners entered into an agreement with Trans-America Equity pursuant to which petitioners paid Trans-America $20,400 in cash and transferred to Trans-America all of the stock of Gillespie Properties, Inc., at an agreed valuation of $40,000 subject to an option to repurchase such stock at a later date. Petitioners thereupon obtained release of the stock of Gillespie Decals, Inc.

At the outset it must be recognized that as a result of the discharge of the debentures there arose an obligation running from Gillespie Equipment, Inc., to the petitioners. It is immaterial whether that obligation arose by operation of the law of subrogation or whether there was only an implied obligation on the part of the debtor to make whole the petitioners for the loss sustained on account of the debtor's default. In either case, there was a "debt" within the meaning of section 166 of the Code. *Putnam* v. *Commissioner*, 352 U.S. 82 (1956); *Bert W. Martin*, 52 T.C. 140 (1969); *Stratmore* v. *United States*, 420 F. 2d 461 (C.A. 3, 1970); *United States* v. *Hoffman*, 423 F. 2d 1217 (C.A. 9, 1970).

Although in the *Putnam* case the Supreme Court found that the guarantor took over the worthless obligation by operation of the law of subrogation, that decision has been given a broad interpretation by this Court. *Bert W. Martin, supra.* In this, we have been joined by the Court of Appeals for the Third Circuit in the *Stratmore* case and the Court of Appeals for the Ninth Circuit in the *Hoffman* case. In *Stratmore*, the court said:

> It is not meaningful to emphasize unduly the common law principle of subrogation in analyzing the substantial realities upon which federal taxation is based. When the creditor turns to the guarantor for payment, the debt is already uncollectible. In both *Putnam* and the present case the claims against the debtors were at all relevant times no more collectible in the hands of the guarantors than in those of the original lender. To allow the tax result to turn on the presence or absence of this technical right of subrogation under state law would be to undermine the *Putnam* doctrine: taxpayers could change capital losses to ordinary losses almost at will. For example, every guarantor could obtain an ordinary loss simply by reaching an agreement with the creditor for payment of less than the full amount of the guarantor's liability, and thus avoiding any subrogation. We hold that taxpayers' payment pursuant to the guarantees was not a loss under section 165(c)(2) but rather a non-business bad debt under section 166(d).

Respondent does not question that petitioners sustained a loss on account of payment of the debt of Gillespie Equipment, Inc. Gillespie Equipment, Inc., was hopelessly insolvent at the time. Respondent contends, however, that the transaction resulted in a loss on account of a nonbusiness bad debt subject to the limitations of section 166(d).

The petitioners argue that in obtaining the release of the stock of Gillespie Decals, Inc., Robert E. Gillespie incurred a loss which was connected with his employment as the principal executive officer of that company. While this may be have a consequential benefit of having discharged the indebtedness for which the stock was held as collateral security, we must also look to the initial transaction pursuant to which the petitioners pledged that stock. *Serino* v. *United States*, 252 F. Supp. 717 (D. S.C. 1966); cf. *George P. Weddle*, 39 T.C. 493 (1962), affd. 325 F. 2d 849 (C.A. 2, 1963).

The petitioners' pledge was made in connection with their guaranty of the debentures issued by Gillespie Equipment, Inc. Petitioners contend that the loss resulting from this guaranty was proximately related to their positions as corporate officers, rather than to their interests as investors in the corporation.

It is clear from the record that in obtaining financing through Trans-America Equity, the petitioners were acting as stockholders and not for the purpose of providing additional income to Robert E. Gillespie, individually. The collateral was not the sole property of Robert E. Gillespie. It was the property of all the stockholders. In determining the nature of the loss, we must look to that transaction and not to the fact that the subsequent default may have jeopardized Robert E. Gillespie's employment with Gillespie Decals, Inc.

In this case, while Robert E. Gillespie was the principal officer of Gillespie Equipment, Inc., and undoubtedly intended to profit from his services for the corporation, the true nature of the transaction with Trans-America was that of a stockholder furnishing collateral in order to obtain additional working capital for the corporation. Applying either the primary-motivation test of *Niblock* v. *Commissioner*, 417 F. 2d 1185 (C.A. 7, 1969), affirming a Memorandum Opinion of this Court, or the significant-motivation test of *Weedle* v. *Commissioner*, 325 F. 2d 849 (C.A. 2, 1963), affirming 39 T.C. 493 (1962), it is clear that the petitioners have not met their burden of showing that Robert E. Gillespie's interest as an employee was the motivation for guaranteeing the corporate notes. See *Stratmore* v. *United States*, *supra.*

Dorothy B. Gillespie was not in the trade or business of being a corporate officer. She received no salary from Gillespie Equipment, Inc., and there is no indication that her time, attention, or services were devoted to the business conducted by Gillespie Equipment, Inc. Compare *Weddle* v. *Commissioner*, *supra.* Her status was that of an investor. See *Whipple* v. *Commissioner*, 373 U.S. 193 (1963).

Petitioners' reliance on those cases which hold that working as a corporate executive for a salary may be a trade or business, e.g., *Trent* v. *Commissioner*, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960), is misplaced. See *Eugene H. Rietzke*, 40 T.C. 443 (1963). Though Robert E. Gillespie was a salaried executive of Gillespie Equipment, Inc., and Gillespie Decals, Inc., the petitioners have not demonstrated that Mr. Gillespie's bad debt loss as guarantor of the obligations of Gillespie Equipment, Inc., was proximately related to his business of being a corporate executive. See *Stratmore* v. *United States*, *supra.* Since the debt arose out of a "capital" or "nonbusiness" transaction, it must be regarded as a nonbusiness bad debt subject to the limitations of section 166(d). *Whipple* v. *Commissioner*, *supra;* *George P. Weddle*, *supra.*

The same rule would apply with respect to the loss sustained by the petitioners on account of the guaranty of the indebtedness of Gillespie Equipment, Inc., to the United States National Bank of Oregon. This was the joint and several liability of the petitioners and while the petitioners personally guaranteed payment of the indebtedness, there is no evidence that they did so other than in their role as stockholders or investors in the corporation.

In order to provide sufficient space for the business of Gillespie Equipment, Inc., Robert E. Gillespie negotiated an agreement with Gunderson Bros. Investment, Inc., for the lease of a building to be erected by Gunderson. In view of the limited capital of Gillespie Equipment, Inc., it was required that the lease be executed in the name of Robert E. Gillespie, individually, and in the name of Gillespie Equipment, Inc., as joint lessee. However, the lease referred to Robert E. Gillespie's obligation as being a personal guaranty. At about the same time, Gunderson Bros. Engineering Corp. (an affiliate of Gunderson Bros. Investment, Inc.) agreed to provide financing for the inventory of Gillespie Equipment, Inc., under a "flooring plan" of financing. As a condition for such financing, Robert E. Gillespie, individually, guaranteed the payment of any amounts due from Gillespie Equipment, Inc.

In the settlement with the Gunderson companies, the amount paid on account of the liability under the lease and the amount paid on account of the breach of the terms of the "flooring plan" of financing were not stated separately. All claims by the Gunderson companies were released and discharged upon the payment by Robert E. Gillespie of $3,000 in cash and the transfer of property making up a total payment of cash or its equivalent of $21,357.33.

We believe that the loss sustained by Robert E. Gillespie on account of the settlement of his liability under the lease with Gunderson Bros. Investment, Inc., cannot be distinguished from the loss incurred on account of the guaranty of the loan from Trans-America Equity. The one difference between the guaranty of the rental payments to Gunderson Bros. Investment, Inc., and the guaranty of the repayment of the loan from Trans-America Equity was that the guaranty to Gunderson Bros. Investment, Inc., was not required of the other stockholders, but represented the separate liability of Robert E. Gillespie. The record does not justify a finding that there was even significant employee motivation on the part of Robert E. Gillespie in providing the guaranty.

In the year prior to the execution of the lease, 1962, and in the year the lease was executed, 1963, Robert E. Gillespie's salary from Gillespie Equipment, Inc., did not exceed $3,400 per year. On the other hand he had a considerable proprietary interest in Gillespie Equipment, Inc.

that would be both protected and enhanced as a result of the additional space that was to be made available under the lease. Further, the lease provided that when Gillespie Equipment, Inc.'s net worth increased, Robert E. Gillespie could be released from his personal guaranty. This provision indicates to us that Robert E. Gillespie was dealing with Gunderson Bros. Investment, Inc., in his capacity as the controlling shareholder of Gillespie Equipment, Inc.

Since the amounts paid by Robert E. Gillespie under the "flooring plan" of financing and under the lease were not stated separately, the Court is unable to distinguish between Mr. Gillespie's loss under the financing agreement with Gunderson Bros. Engineering Corp. and his loss under the lease with Gunderson Bros. Investment, Inc. The record does not justify the application of a different rule to the loss suffered under the financing agreement. It also must be presumed that, as in the transaction with Gunderson Bros. Investment, Inc., Robert E. Gillespie was dealing with Gunderson Bros. Engineering Corp. in his capacity as the controlling shareholder of Gillespie Equipment, Inc.

In our opinion, the amount of $21,357.33 paid by Robert E. Gillespie to the Gunderson companies constituted a nonbusiness bad debt subject to the limitations of section 166(d). See *Stratmore* v. *United States, supra.*

The same rule should also apply with respect to the losses sustained by Robert E. Gillespie as a result of his guaranty on the lease or purchase of business equipment by Gillespie Equipment, Inc. Accordingly, the payments which he made in the year 1965 to satisfy that liability amounting to $996.76 and $4,421.84 are properly deducted only as nonbusiness bad debts.

Finally, the petitioners claimed deductions of $8,600 for the year 1963 and $11,821 for the year 1965 on account of advances made to Gillespie Equipment, Inc., by Dorothy B. Gillespie. Respondent does not question the "worthlessness" of the resulting indebtedness, but has disallowed the deductions on the ground that the loss arose on account of worthlessness of a nonbusiness bad debt subject to the limitations of section 166(d).

It is clear from the record that Dorothy B. Gillespie was not in the trade or business of being a corporate officer. She could derive no income from Gillespie Equipment, Inc., other than as a stockholder. With respect to these advances, she was acting as an "investor" or "stockholder." *Whipple* v. *Commissioner, supra.* Loans by investors to a corporation must be treated as nonbusiness bad debts within the meaning of section 166(d). *Whipple* v. *Commissioner, supra.*

With respect to the advances made by Dorothy B. Gillespie, any resulting loss falls squarely within the definition of a nonbusiness bad debt under section 166(d).

An additional deduction of $8,149 was claimed for the year 1965 on account of a note in the amount of $8,149 issued on December 3, 1963, by Gillespie Equipment, Inc., and payable to Robert E. Gillespie. Respondent questions in his brief whether the note, in fact, represented an indebtedness to Robert E. Gillespie. However, this issue was not raised at the time of the trial. In his opening statement, counsel for the respondent said:

> It is the contention of the Respondent that in each of the eight items which your Honor has before you in that guide sheet, in each case it will be exposed at the trial that the facts indicate that there's a bad debt in every case, and that the nature of that bad debt is a non-business bad debt, so that the income tax deductions treatment would be limited to the short-term capital gain treatment.

The respondent's belated attempt to rely on the petitioner's failure to prove that there was a debt must be rejected. However, for the reasons expressed above, we hold that the transaction gave rise to a nonbusiness bad debt subject to the limitations of section 166 (d).

Reviewed by the Court.

*Decisions will be entered for the respondent in docket Nos. 3210–67 and 6468–67.*