MORRIS B. PARKER AND JOAN PARKER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Parker v. Commissioner
Docket No. 5306-71.
United States Tax Court
T.C. Memo 1974-60; 1974 Tax Ct. Memo LEXIS 259; 33 T.C.M. (CCH) 289; T.C.M. (RIA) 74060; March 11, 1974, Filed. Taylor Gandy, for the petitioners. D. Derrell Davis, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: Respondent determined deficiencies in the Federal *260 income taxes of petitioners for the taxable years 1966 and 1967 in the respective amounts of $10,346.47 and $10,714.04. Certain concessions have been made by the parties. The only issue presented for decision is whether the petitioners are entitled to a business bad debt deduction for losses incurred by petitioner Morris B. Parker on payments in the amounts of $16,843.48 in 1966 and $26,350.52 in 1967 under guarantees of a debt of a corporation in which he was a shareholder. FINDINGS OF FACT Some of the facts have been stipulated.The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Morris B. Parker and Joan Parker are husband and wife, who resided in Fort Worth, Texas, at the time of filing their petition herein. Their joint Federal income tax returns for the taxable years 1966 and 1967 were filed with the district director of internal revenue at Dallas, Texas. Since Joan Parker is a party because she filed joint income tax returns with her husband during the taxable years, Morris B. Parker will sometimes be referred to herein as "petitioner." Petitioner is an architect. He has practiced since 1953, and has *261 been a member of a partnership since 1966, in Fort Worth, Texas. His early architectural practice was devoted to residential design. His later endeavors have been directed toward the design of schools and commercial projects. Admiral Development Corporation (Admiral Development) was incorporated in the State of Texas for the purpose of franchising motels throughout the United States. The corporation had negotiated a lease on land in Arlington, Texas, upon which a prototype motel was to be built to serve as the model for the construction and the franchising of other motels, and initial financing for its construction had been arranged. Petitioner made a capital contribution to the corporation in the amount of $500 on September 4, 1962, and either became the owner of not less than 12 percent of the outstanding shares of its stock or obtained a right to receive shares of stock in that percentage. In 1962, Admiral Motor Hotel of Texas (Admiral of Texas) was incorporated under the laws of the State of Texas, with a capital structure of $1,000, specifically for the purpose of owning and operating the Arlington motel. Petitioner was offered the opportunity to become a shareholder *262 in Admiral of Texas because the incorporators needed his services as an architect. Petitioner hoped to serve as the architect for the succeeding motels to be franchised by Admiral Development. He was familiar with the history of the architect who was one of the original organizers of Holiday Inns of America. That architect had designed all of the Holiday Inns across the country and was principally designing the later motels by the use of a computer. Petitioner envisioned himself as occupying a similar position with Admiral Development. His stock interest in Admiral of Texas was essentially a gratuity for preparing the architectural drawings for the first motel. The other five shareholders in the two corporations were Warren B. Donaldson, Dr. Milton Adami, Monty Gray, Dave Pitts, and Homer Newman. The relative percentage of stock ownership of the shareholders was essentially the same in both corporations except that Warren Donaldson owned only 25 percent of the capital stock of Admiral Development while he owned 51 percent of the outstanding shares of Admiral of Texas. Petitioner's 12 percent stock interest in Admiral of Texas was purchased with an initial capital contribution *263 of $153.34 and a later contribution of $144. Petitioner was the secretary-treasurer of Admiral of Texas but received no compensation and was not active in the management of the corporation. Admiral of Texas was managed by Community Inns of America (Community Inns), whose shareholders were unrelated to the Admiral group shareholders. Prior to his involvement with Admiral of Texas, the petitioner had served as an architect in designing one motel, but he had never previously held a management position or stock ownership in the motel business. Prior to the incorporation of Admiral of Texas, the shareholders of Admiral Development, which at this time had been renamed the Admiral Motor Hotels of America (Admiral of America), entered into a letter of intent between themselves and the respective corporations. The agreement provided that the leases and options on the land upon which the Arlington motel was to be built were to be transferred to Admiral of Texas and that corporation was to be granted a franchise to operate as a part of the proposed national chain of Admiral Motor Hotels. Warren B. Donaldson agreed to guarantee the interim financing and permanent loan on terms satisfactory *264 to the respective lending institutions, to the extent of $475,000, in exchange for 51 percent of the stock of Admiral of Texas. Donaldson's net worth in February 1963 was in excess of $1,000,000. Permanent financing for the Arlington motel was to be obtained from Lincoln Liberty Life Insurance Company and Lone Star Gas Company. The interim construction loan of $580,000 was obtained by Donaldson at the Republic National Bank (Republic) in Dallas, Texas, on February 12, 1963. As a condition of receiving the loan from Republic, all of the shareholders of Admiral of Texas were required to personally guarantee the $580,000 interim note. An interim draw was received by the corporation from the bank immediately upon the execution of the note. By February 12, 1963, petitioner had already completed his architectural workings and drawings for the Arlington motel. After that date, he had only to supervise the actual construction of the motel. Of the total architectural fee of $24,871.85, which he charged the corporation, petitioner had earned $22,700 prior to February 12, 1963, but he had not been paid any of this amount by the corporation. Since he received no other income while designing *265 the motel, Parker had an accumulation of unpaid bills relating to the motel. He was paid $22,700 from the amounts received from the Republic loan, which enabled him to meet his current payroll. The balance of $2,171.85 was received by him in 1964, when the motel was being constructed. Because of Donaldson's guarantee agreement with the shareholders, the petitioner had not anticipated signing as a personal guarantor of the corporation's interim financing. However, he personally guaranteed the loan because he wanted to receive his unpaid fees and did not attach any great risk to the guarantee in view of Donaldson's substantial financial worth. The fee paid the petitioner in 1963 represented 13 percent of his gross income for that year. His net worth in February 1963 was between $20,000 and $25,000.
The Admiral Motor Hotel in Arlington was opened in August 1963 with only 50 percent of the rooms completed. The corporation had intended to take advantage of the tourists generated by the nearby "Six Flags Over Texas" amusement park, but the amusement park's season closed 16 days after the opening of the motel. In order to meet operating expenses and keep the motel open during its first *266 winter so that the motel could be shown to prospective franchisees, the corporation had to borrow additional funds. The amount of $20,000 was borrowed by the corporation from the First National Bank of Denton, Texas (First National) soon after the motel was opened. On May 4, 1964, prior to the beginning of the Six Flags' season, $15,000 was borrowed from Arlington State Bank (Arlington) for operating expenses. In both instances promissory notes were executed by Admiral of Texas and the notes were personally guaranteed by the minority shareholders which included the petitioner. Admiral of America later franchised two other motels, the Beaumont Hotel and a motel in Angleton, Texas. No architectural work was required on the hotel in Beaumont since it was already operative. The petitioner acted as an architectural advisor without compensation on the construction of the Angleton motel. The architectural plans for this motel were not drawn by him. The designs of several other motels to be franchised by Admiral of America were on the drawing boards when Community Inns, the management corporation for the motels, went bankrupt. Warren Donaldson sold his majority interest in Admiral *267 of Texas before permanent financing had been obtained for the motel. When Lincoln Liberty learned of his disposition, it withdrew its commitment for the financing. On July 13, 1964, the petitioner and the other minority shareholders of Admiral of Texas sold their shares of stock in the corporation to Exchange Estates, Inc. (Exchange). Petitioner received $739.59 for his 120 shares. Exchange agreed to "indemnify and hold harmless" the shareholders as to all obligations and liabilities arising from the construction, equipping, furnishings, and operation of Admiral of Texas. Subsequent litigation ensued between the minority shareholders of Admiral of Texas and the majority shareholder of Exchange, S. Mort Zimmerman, over the indemnification agreement. The First National loan had been renewed on January 23, 1965, by the original minority shareholders of Admiral of Texas, including the petitioner, since they were expecting Zimmerman to repay the note. A Texas appellate court ultimately determined, however, that Zimmerman was not personally liable for the debts of the corporation. In 1965, Republic, Arlington, First National, Finger Contract Supply Company (Finger's), and Liberty *268 Sign Co. (Liberty) brought suit in various Texas district courts against Admiral of Texas and its guarantors by reason of the corporation's default on its obligations. Donaldson impleaded the petitioner as a third party defendant in the Finger's and Liberty suits to recover 12 percent of the deficiency judgments therein and instituted suit against his fellow guarantors with respect to the Republic judgment. The creditors recovered judgment on their suits. Donaldson satisfied all but $275,806.27 of the judgment recovered by Republic. Dr. Adami personally satisfied the Arlington and First National judgments and was assigned the balance remaining due on the judgment recovered by Arlington. As owner of the First National note, Adami filed suit against the petitioner to recover 12 percent of the amount of the note. In a countersuit filed against Donaldson, Homer H. Newman who had held the same number of shares in Admiral of Texas as petitioner, sought damages for Donaldson's breach of his agreement to guarantee the corporate obligations. Donaldson subsequently dismissed his suit against Newman since the damages alleged by Newman substantially exceeded the contribution sought by Donaldson. *269 Newman was not required to pay any amount of money to Republic, Arlington, First National, Donaldson, or any other creditor of the corporation. Petitioner's firm was selected as the architect for the south campus of the Tarrant County Junior College District (College) in the latter part of 1965. The preliminary work had been completed and the college was billed in the amount of $20,000 for architectural services rendered. The chairman of the board of the college informed the petitioner that he would not be able to authorize payment due to the outstanding judgment that had been recorded against the petitioner relating to the Admiral of Texas guarantees. The chairman explained that the college would cancel the agreement with the petitioner and refuse to pay him if the judgment was not removed. Petitioner's dominant motivation in agreeing to effect a settlement with Donaldson and Adami on the outstanding judgments was business related. He wanted to receive some $80,000 or $85,000 in fees which had already been earned, he wanted to remain as the architect on the college job, and he wanted to protect his reputation as an architect by avoiding the bankruptcy which would have resulted *270 had an agreement not been reached. The gross income ultimately received by the petitioner from his work on the college in the taxable year 1966 was $456,541, which represented 93.5 percent of his gross income for that year. On March 8, 1966, a settlement agreement was executed between Donaldson and the petitioner in which the parties estimated that his 12 percent share of the deficiencies under the various judgments which had been partially satisfied by Donaldson was $57,272.72. The agreement provided that $5,000 was to be paid directly to Republic and that an interest-bearing promissory note in the amount of $52,272.72 was to be made payable to Donaldson. The $5,000 was paid to Republic by the college and charged against petitioner's fee. In a separate agreement reached between the petitioner and the college, he agreed to provide the college with current statements of payments made to Donaldson and authorized the College to make payments directly to Donaldson from amounts which were then due him. On March 10, 1965, Republic executed a release of its judgment lien filed against the petitioner in consideration of his settlement with Donaldson. On the following day the petitioner *271 received the $20,000 which had been billed to the college. Timely payments were made by him on the note during the taxable years 1966 and 1967. Petitioner was instructed to submit the payments to Republic, which received them as security for Donaldson's obligations with the bank. The $5,000 down payment and monthly installment payments were deducted by the petitioners on their Federal income tax returns as business bad debt deductions in those years. Petitioner also effected a settlement with Dr. Adami on March 8, 1966, with respect to his guarantee of the Arlington and First National notes and the consequent judgments which had been obtained by Adami upon the satisfaction of those judgments. Adami's judgment liens filed against the petitioner were released in consideration of his payment of $1,765.66 to Adami and the execution of a promissory note in the amount of $5,297.58. The settlement agreement and release of liens were required to be filed with the college before petitioner's $20,000 architectural payment could be disbursed. The total of the payments made to Adami in 1966 and claimed as part of the petitioners' business deductions were $3,699.48. In May and July *272 of 1967, the petitioner sold two real estate lots situated in Fort Worth, Texas, which had been pledged to secure the payment of the Donaldson note. The total proceeds of the sales ($20,202.95) were paid directly to Donaldson in reduction of petitioner's liability to him. The petitioners claimed a business bad debt deduction in 1967 by reason of the payments made to Donaldson from such sales. In his statutory notice of deficiency the respondent disallowed the claimed business bad debts of the petitioner with the explanation that the debts "were not incurred in the operation of [petitioner's] trade or business." The debts were determined to be deductible as nonbusiness bad debts. ULTIMATE FINDINGS 1. Petitioner's guarantees of the notes of Admiral of Texas were proximately related to his trade or business of being an architect. 2. Petitioner's dominant reason for making the guarantees was to insure the success of Admiral of Texas so that he could enhance his architectural practice. OPINION The issue confronting us is whether payments made by the petitioner to effect the release of judgment liens filed against him by reason of his guarantees of certain defaulted corporate *273 obligations of Admiral of Texas entitled him to a deductible business loss or business bad debt deduction under either section 165(c) (1) or section 166 of the Internal Revenue Code of 1954. [1]
It is the petitioner's contention that the payments made to Donaldson and Adami were either business losses or worthless debts acquired in connection with his architectural business or incurred in the business itself. He claims that the three guarantees were executed so as to both promote and protect his architectural practice. To the contrary, respondent argues that the guarantees were not related to the petitioner's architectural business, but were prompted by his desire as an investor to promote the business of Admiral of Texas. When the petitioner sustained a loss on the payments made pursuant to his guarantees of the corporate debts and the corporate debtor was unable to satisfy him as guarantor, a bad debt loss was created because the corporation's *274 obligations to its creditors had become an obligation to the guarantor by subrogation. Putnam v. Commissioner, 352 U.S. 82 (1956); Estate of Martha M. Byers, 57 T.C. 568, 574 (1972); Robert E. Gillespie, 54 T.C. 1025, 1031 (1970), affirmed by unpublished order (C.A. 9, 1972). Section 166 therefore applies to these transactions as a bad debt loss. Although the petitioner seeks to subordinate his guarantees to Donaldson's agreement to guarantee the interim and permanent financing of the corporation to the extent of $475,000, he does not assert here that the payments made by him failed to create a debt running from the original debtor to the guarantor. See Bert W. Martin, 52 T.C. 140 (1969); Eugene H. Rietzke, 40 T.C. 443 (1963); J. J. Shea, 36 T.C. 577 (1961), affirmed per curiam 327 F.2d 1002 (C.A. 5, 1964). Section 166[2] provides a deduction for all debts which have become worthless during the taxable year. While business bad debts are deductible as ordinary losses, nonbusiness bad debts *275 may be deducted only as short-term capital losses. A nonbusiness bad debt, as specified in section 166(d) (2), is a debt of a noncorporate taxpayer other than - "(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Petitioner argues that both exceptions are applicable to him. While he agrees that he is not in the motel trade or business, he asserts, alternatively, with regard to exception (B), that the worthless debts were also incurred in his architectural business because the settlement with Donaldson was effected in order to preserve his position as the architect for the college and thus avoid losing an already earned fee of $85,000. *276 To sustain the petitioner's business bad debt deduction, we must first find a direct relationship between the guarantees from which the losses arose and the trade or business engaged in by the taxpayer. Estate of Martha M. Byers, supra, at 577; Oddee Smith, 55 T.C. 260, 268 (1970), vacated and remanded per curiam 457 F.2d 797 (C.A. 5, 1972).[3] Once we have found such a direct relationship, we must then determine whether the relationship is a proximate one. Sec. 1.166-5(b), Income Tax Regs. This proximity is measured by the motivation prompting the taxpayer to make the guarantee. If his "dominant motivation," rather than merely a significant motivation, was his business as an architect, the petitioner is entitled to a worthless debt deduction. United States v. Generes, 405 U.S. 93 (1972). Such a determination is essentially factual. The Supreme Court in Generes was only concerned with the issue of the proximity of the relationship and *277 whether the dominant motivation, as opposed to the significant motivation of the taxpayer, should be inquired into for purposes of the deduction.Implicit in the Court's opinion was the assumption that the initial connection between the loans and the taxpayer's trade or business had been sufficiently established. The Court of Appeals for the Tenth Circuit has pointed out, in an interpretation with which we are in basic agreement, that the Supreme Court did not mean to displace the initial requirement of a direct relationship with that of a purely dominant motivation inquiry. See Hogue v. Commissioner, 459 F.2d 932, 939, fn. 11 (C.A. 10, 1972), affirming a Memorandum Opinion of this Court. We think the evidence presented by the petitioner adequately establishes the initial relationship between the various guarantees and the petitioner's trade or business. Admiral of Texas was formed for the purpose of constructing and operating a motel as a prototype for other motels to be franchised by Admiral of America, whose shareholders were essentially the same as the shareholders of Admiral of Texas. Petitioner was the architect of the first motel and the likely architect *278 for the motels to be constructed and franchised in the future. The loans guaranteed by him enabled the motel to be constructed and operated so as to attract Admiral franchises and, additionally, provided the funds out of which his architectural fee was paid. We believe other nonshareholder-architects, fortified with Donaldson's letter of intent, would have been willing to subject themselves to such guarantees of the remote potential liability of a corporation in order to recover an earned fee of almost $23,000 and, more importantly, to provide themselves the opportunity to serve as the architect in the establishment of a nationwide motel chain. We are also convinced that the relationship between the petitioner's architectural business and the guarantees was a proximate one under the Generes decision. In executing the various guarantees and the renewal of the First National loan, the petitioner's dominant motivation was undeniably business related. With respect to the Republic guarantee, he was primarily concerned with obtaining both his earned but unpaid architectural fee of $22,700 and future architectural fees from the design of additional franchisee motels. At the time the *279 Republic guarantee was signed, he had an accumulation of unpaid bills relating to his work on the motel's design. The interim draws enabled the petitioner to pay these bills and meet his current payroll, which would not have been possible if another loan had been sought at a later date. His dominant motivation in signing the Arlington and First National guarantees was to ensure that the Arlington motel would be operational during its first year so that it could be attractively exhibited to prospective franchisees, which in turn offered the petitioner the potential of increased architectural fees. The motivation underlying the renewal of the First National loan in 1965, after he had disposed of his stock in Admiral of Texas, is not relevant to our inquiry. While the petitioner perhaps could have sold his stock to the other shareholders and collected his fee without executing the guarantees, as respondent suggests, he would not have been in quite the same position that he occupied as a shareholder in the two corporations. As a shareholder and officer of Admiral of Texas, and a shareholder in Admiral of America, he was able to maintain a closer association with the other shareholders *280 than was otherwise possible as an independent architect. Although the record does not show whether petitioner was a shareholder in Admiral of America, we have found as a fact that he owned not less than 12 percent of the outstanding stock of the franchisor corporation based upon his capital contribution of $500 made to that corporation on September 4, 1962. Even if the petitioner could not be considered a shareholder in Admiral of America, he was still in an excellent position to be called upon to render architectural designs for both the franchisor corporation and the franchisee motels as a result of his relationship with the shareholders of Admiral of America and his access to the corporate information of the franchisor. As was the intent of the advertising agent in Stuart Bart, 21 T.C. 880 (1954), who hoped to obtain other clients through his shareholder relationship with a client magazine publisher, the petitioner wanted to receive the future architectural business of Admiral of America and its franchisees. Even though the petitioner was an officer in Admiral of Texas, he received no compensation and took no part in the management of the corporation. Respondent's *281 assertion that the petitioner did not guarantee the corporate loans with an expectation of retaining a source of continuing architectural income from Admiral of Texas fails to take into account the identity between the shareholders of the two corporations and the significance of the petitioner's involvement with the design and construction of the first motel to be franchised by Admiral of America. To be sure, the appearance and style of the prototype motel was of upmost importance to the franchisor corporation in light of the usual practice among franchisors of demanding a somewhat basic similarity of design in newly constructed franchises. There would thus be a strong tendency on the part of the shareholders to rely upon the architect of the Angleton motel, who was also a fellow shareholder, to implement architecturally and stylistically, their "dream" of a nationwide motel chain. In cases where the franchisees were to undertake the architectural planning and construction themselves, the petitioner could expect the shareholders to provide him with a referral. It is not detrimental to petitioner's case that he failed to receive additional architectural fees from Admiral of America *282 or its franchisees subsequent to the guarantees. He only retained his stock in Admiral of Texas 11 months after the Arlington motel was constructed, and was prompted to sell it after Donaldson's stock had been disposed of and the commitment letters for permanent financing had been withdrawn. When the management corporation for the franchisor went bankrupt, there were architectural plans being developed by the Admiral of America for new facilities to be franchised, but apparently these were never realized. While Admiral of America did succeed in securing two additional franchisees, the old Beaumont Hotel did not require any architectural work and the petitioner, although he did not make the architectural drawings for the later-constructed Arlington motel, did function as an advisor on the architectural work involved. Petitioner relies heavily upon an unreported opinion of this Court, Frank A. Garlove, T. C. Memo 1965-201, which predated Generes. In that case, a practicing lawyer invested in three closely held corporations with the primary intention of insuring himself a regular and dependable flow of legal fees from the corporations and its shareholders. He advanced *283 $15,000 to one of the corporations, Kentucky Looms, in which he was an officer and director and in which he held approximately 25 percent of its outstanding common stock, but the corporation subsequently was forced into receivership. In allowing the taxpayer a business bad debt deduction by reason of the worthlessness of his loan, we found that the primary purpose of the advances was to assist him in developing and expanding his law practice. In the 10-year period preceding the taxable year in issue, the fees from the three companies comprised about 25 percent of the taxpayer's total income from his legal practice. The taxpayer also succeeded in handling the private legal matters and probating the estates of two stockholders of Kentucky Looms as a result of his close association with them in the affairs of Kentucky Looms. We pointed out that the possibility that the taxpayer had advanced $10,000 to protect a capital investment of $7,040 was both unsupported by the record and theoretically unsound. A close analogy can be drawn between the difficulties encountered by Garlove in expanding his practice and those of the architect in this case. Petitioner's architectural business *284 also depended to a large extent upon reputation, referrals, and personal friendships. All of these needs could be satisfied in significant measure through his shareholder status in Admiral of Texas. He may have also been interested in seeing the Arlington motel succeed, in view of his proprietary interest, but his dominant motivation was unmistakably to become "locked in" as the architect for the succeeding motels, even though the guarantees were required of him because he was a shareholder and he signed in such a capacity. This record simply will not support a finding that the petitioner's dominant motivation in signing the guarantees was that of a concerned investor participating in the business and seeking to enhance his investment. Whipple v. Commissioner, 373 U.S. 193, 202 (1963); Niblock v. Commissioner, 417 F.2d 1185, 1187 (C.A. 7, 1969). It would be ludicrous for us to conclude that the petitioner executed guarantees amounting to $615,000 to protect an original capital investment of $297. Respondent's argument that such a risk was insignificant as compared to the investment rewards obtainable from a 12 percent ownership of a nationwide chain *285 of franchised motor hotels does not impress us as realistic in view of the fact that only the loans of Admiral of Texas, a corporation established for the construction of a single motel, were guaranteed by the petitioner rather than any loans of the potentially nationwide franchisor corporation. It is clear from the record that the petitioner improperly included among his business bad debts the amounts of $144 and $500 which had been contributed as capital to Admiral of Texas and Admiral of America, respectively. Since such amounts do not constitute debts for purposes of section 166, and the petitioner has not demonstrated that his securities in these corporations become worthless in whole or in part in accordance with the requirement of section 165(g), the respondent's determination with respect to $644 is sustained. In view of our conclusion that the amounts paid by the petitioner pursuant to his various guarantees were properly deductible as business debts created or acquired in connection with an architectural business which became worthless during the taxable year, it is not necessary for us to consider his alternative contention that the business bad debt was incurred *286 in his trade or business under exception (B) of section 166(d) (2). To reflect the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 in effect during the taxable years in issue. ↩
2. SEC. 166. BAD DEBTS. (a) GENERAL RULE. - (1) WHOLLY WORTHLESS DEBTS. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) PARTIALLY WORTHLESS DEBTS. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * (d) NONBUSINESS DEBTS. - (1) GENERAL RULE. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
3. On remand, see Oddee Smith, 60 T.C. 316↩ (1973).