RICHARD C. HUNSAKER and VIRGINIA A. HUNSAKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent HUNSAKER DEVELOPMENT CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hunsaker v. Commissioner
Docket Nos. 9133-72 and 9134-72.
United States Tax Court
T.C. Memo 1975-225; 1975 Tax Ct. Memo LEXIS 141; 34 T.C.M. (CCH) 985; T.C.M. (RIA) 750225; July 14, 1975, Filed Thomas E. O'Sullivan and Gerard C. Tracy for *143 the petitioners. H. Lloyd Nearing, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated proceedings respondent determined the following deficiencies in petitioners' income taxes: Taxable
Docket
Year Petitioner
No.
Ending
Deficiency
Richard C. Hunsaker and
9133-72
12-31-68
$63,953.39
Virginia A. Hunsaker
12-31-69
91,710.35
12-31-70
23,110.20
Hunsaker Development Co.
9134-72
10-31-70
10,983.81
In docket No. 9133-72 the issues, after certain concessions, are as follows: (1) Whether losses sustained by Richard C. Hunsaker from certain loans and from certain payments made as guarantor are deductible in full under either section 162, [1]165, 166(a)(1), or 166(f), or are deductible only as nonbusiness bad debts under section 166(d); (2) Whether respondent erred in redetermining the useful life of certain property for the purpose of depreciation. In docket No. 9134-72 the issue is whether respondent erred in disallowing $34,400 of Hunsaker *144 Development Co.'s bad debt loss deduction. FINDINGS OF FACT Some of the facts have been stipulated and these stipulations are adopted as a part of our findings. Petitioners Richard C. Hunsaker (hereinafter sometimes referred to as petitioner) and Virginia A. Hunsaker are husband and wife and resided in Corona Del Mar, Calif., at the time of the filing of their petition with this Court. During the taxable years 1968, 1969 and 1970 joint returns were timely filed with the Internal Revenue Service Center at Ogden, Utah. Petitioner Hunsaker Development Co. (hereinafter referred to as HDC) is a California corporation having its principal office in Santa Ana, Calif., at the time of the filing of its petition with this Court. For the fiscal years ending October 31, 1969, and October 31, 1970, HDC timely filed its income tax returns with the Internal Revenue Service Center at Ogden, Utah. During the years in issue and prior thereto petitioner, a licensed general contractor and real estate broker, was engaged in the real estate development business. Between 1954 and 1961 he and his father, S. V. Hunsaker, Sr., through joint ventures, partnerships and corporations, acquired, developed *145 and sold real estate, and built and sold over 5,000 homes and other buildings. In addition to associating with his father, petitioner also associated with S. V. Hunsaker, Jr. (his brother), Frank D. Patty (hereinafter referred to as Patty) and A. Douglas Martin in the subdividing of land and the building of homes. In the selling of tract homes built by the various businesses in which petitioner had an interest, two methods of financing were used: (1) a conditional sales contract or (2) a direct sale with financing. Under the former method the property is subject to a first loan from a financial institution secured by a deed of trust, with petitioner or his business retaining title for the duration of the contract and its obligation under the first loan. The purchaser takes immediate possession and makes single monthly payments to petitioner or his business, who then makes the payments on the first trust deed, pays the taxes and insurance, and applies the balance toward their equity. Under the latter method the purchaser takes title and assumes the obligations under the trust deed securing the first loan. If the purchaser is unable to supply the difference between the purchase price *146 and the first loan, petitioner or his business will take back a second trust deed from the purchaser covering this difference. In 1957 petitioner, his father and his brother formed a partnership known as SRS Investments with each partner owning a one-third interest. The partnership was formed to engage in real estate investments. In 1967 petitioner purchased his father's one-third interest. In 1959 petitioner and his father formed a partnership known as S. V. and R. C. Company. This partnership subdivided land and built and sold single family residences. In 1961 this partnership and petitioner formed a joint venture known as Cienega Homes which also subdivided land and built and sold single family residences. In January 1962 The Hunsaker Corporation was formed under California law to acquire the assets of twelve corporations and two partnerships (one engaged in real estate development and the other in the wholesale and retail sale of lumber). All of the corporations and partnerships were owned by petitioner, his father and his brother. In April 1962 the corporation changed its name to S. V. Hunsaker & Sons. S. V. Hunsaker & Sons went public in May 1963. Petitioner became president *147 of the corporation in 1962 and remained in that capacity until May 31, 1964, when the corporation's assets were acquired by Occidental Petroleum Corporation (Occidental) in exchange for stock in a section 368(a)(1)(C) reorganization. In connection with acquisition of the assets, Occidental and petitioner entered into an employment agreement whereby petitioner remained as president and chief operating officer of S. V. Hunsaker & Sons, now a subsidiary of Occidental. In 1965 he became chief executive officer. On July 21, 1966, the employment agreement was terminated and petitioner returned to activities related to general real estate development. In September 1966 petitioner caused the incorporation of Jenkin Construction Co. This California corporation, owned 50 percent by petitioner and 50 percent by William R. Jenkin, was formed to provide general engineering services and to engage in heavy construction enterprises. In October 1966 petitioner formed Rich Service Co., a partnership owned 75 percent by him and 25 percent by James Sax, to engage in the coin operated laundry business. This partnership was still in existence at the time of the trial. In February 1967 petitioner *148 formed a joint venture known as Paramount Properties with Dewain R. Butler for the development of industrial property. In addition to a capital contribution of $29,042.68, petitioner loaned the joint venture $89,100 in 1968. On November 1, 1969, this joint venture was dissolved. In January 1968 petitioner became the general partner of a limited partnership known as Polynesian Apartments. In addition to a 20 percent interest as general partner, he also invested $72,000 to acquire a 40 percent limited interest in the partnership. This partnership was formed to acquire 138 apartment units in Pomona, Calif.
Between July 1966 when petitioner's employment agreement with Occidental was terminated and the end of 1970, petitioner operated approximately 1,300 apartment units of which he owned approximately 1,000. In June 1965 petitioner's father organized a corporation known as S. V. H. Investments (hereinafter referred to as SVH). This California corporation, of which petitioner's father owned an 89.52 percent interest, commenced development of land projects in Quail Mountain, Joshua Tree and Serene Lakes, Calif., shortly after its formation. Petitioner did not own any stock in SVH. *149 On May 11, 1967, petitioner purchased an irrevocable letter of Credit from Crocker-Citizens National Bank (now Crocker National Bank) in the amount of $223,811 and deposited it as collateral security with the General Insurance Company of America to protect that company against loss in connection with faithful performance bonds executed by that company in favor of the County of Placer and Sierra Lakes County Water District concerning SVH's Serene Lakes project. The principals on the faithful performance bonds for the subdivision improvements on the Serene Lakes project were petitioner's father and Patty. Patty is not related to the Hunsakers; nor was he shareholder of SVH. His name appeared on the faithful performance bonds only because he was the record owner of the property to be developed by SVH. Placer County and Sierra Lakes County Water District required that the record owner's name appear on the bonds. Patty had acquired title to the undeveloped property at the Serene Lakes project from SVH as security for loans he had advanced to the corporation. It was agreed that he would be held harmless from any liability on the improvements. Patty also extended options, mostly oral, to *150 SVH and petitioner to repurchase the undeveloped land. These options were never exercised. Patty died in December 1969. In 1969 and 1970 petitioner was required to pay $45,129.28 and $82,528, respectively, under the terms of the abovementioned collateral agreement, for expenses SVH could not pay. He did not attempt to recover any of the expenses of completing the improvements at Serene Lakes from Patty since he had agreed, by letter dated January 19, 1968, [2] to indemnify Patty and his wife against any such expense. *151 For the taxable years 1968, 1969 and 1970 petitioners reported the following amounts of income on Schedule C of their income tax returns: Ordinary Income
Business Interest Year
From Sale of Property
Income
1968
$35,532
$ 73,207
1969
14,043
115,742
1970
14,098
119,019
For these same taxable years petitioner reported the following profits (or losses) from their rental operations: Year
Profit (or Loss)
1968
[11,212)
1969
131,126
1970
48,191
For these same taxable years petitioners claimed depreciation deductions on certain apartment and industrial buildings. Respondent decreased the deductions by increasing the useful life of the buildings as follows: Buildings - Apartments
Life Claimed
Life Determined
Compton
25
30
San Gabriel
25
30
Santa Barbara
25
30
Laurelwood
20
30
Buildings - Industrial
733 E. Edna
25
35
808 E. Edna
25
35
828-842 E. Edna
25
35
846-852 E. Edna
25
35
804 E. Edna
25
35
1267 E. Edna
25
35
1223 E. Edna
25
35
1238 Cypress
25
35
1202 E. Edna
25
35
803 Glendora
25
35
*152 During the years in issue HDC was wholly owned by petitioner who was the corporation's president and one of its directors. In July 1968 HDC gave an unsecured promissory note to petitioner in the amount of $34,400. This represented a loan petitioner had previously made directly to SVH. HDC also loaned SVH $100,000 and in return received a promissory note for $134,400, covering the $100,000 it advanced and the $34,400 advanced by petitioner. This note was secured by a grant deed to the remaining unsold lots in Unit 2 of the Serene Lakes subdivision. For the fiscal year ending October 31, 1969, HDC deducted $142,400 as bad debts of which respondent disallowed the $34,400 mentioned above. This disallowance also caused respondent to reduce HDS's net operating loss deduction for its fiscal year ending October 31, 1970, by $34,400. OPINION We will first consider the treatment to be accorded the losses suffered by petitioner from the uncollectibility of certain loans made to his father and his father's corporation, and the payments made as guarantor of one of his father's notes and as guarantor of a performance bond relating to the Serene Lakes project. Neither the classification as *153 debt, the amount, nor the fact of uncollectibility (except as to the guarantor on the performance bond) is in dispute. A loss attributable to the worthlessness of a debt must be regarded as a bad debt loss, deductible as such or not at all. Putnam v. Commissioner,352 U.S. 82, 88 (1956); Estate of Martha M. Byers,57 T.C. 568, 574 (1972), affd. per curiam 472 F. 2d 590 (6th Cir. 1973). Thus the only applicable provision is section 166; [4]sections 162 and 165 are not applicable. It is also immaterial whether the obligations arose by operation of the law of subrogation or by direct advances as both are accorded equal dignity as "debts" within the meaning of section 166. Putnam v. Commissioner,supra;Robert E. Gillespie,54 T.C. 1025, 1031 (1970). Consequently, the loans and guarantees will be treated together. *154 In this instance the question is whether petitioner is entitled to a business bad debt deduction under section 166(a)(1) or a nonbusiness bad debt deduction under section 166(d). With respect to the payments made as guarantor, we must also consider the applicability of section 166(f). Whether a debt is a business bad debt or nonbusiness bad debt is essentially a question of fact, the resolution of which depends upon whether the debt is "proximately" related to the trade or business of the taxpayer. Section 1.166-5(b), Income Tax Regs.[5]Robert E. Imel,61 T.C. 318, 323 (1973). In determining whether a bad debt has a "proximate" relationship to the taxpayer's trade or business, the proper measure is that of the Dominant motive of the taxpayer; significant motivation is not enough. United States v. Generes,405 U.S. 93 (1972). *155 Petitioner broadly claims that the loans and guarantees were made in the course of his trade or business as a real estate developer. He also claims that he was in the trade or business of lending money. He further asserts that a joint venture between SVH and himself existed with respect to the Serene Lakes project. Although petitioner, his father and SVH were all engaged in real estate development, petitioner has not shown that his loans to his father and SVH were directly related to his trade or business. The dominant motive was to aid his father, either through direct loans or through loans to his father's corporation, with the expectation of enabling that corporation to become a financial success. Petitioner had no financial interest in SVH except for the loans. Although petitioner's own companies dealt in real estate development these companies were not directly affected by the success or failure of petitioner's father or SVH. [6] Furthermore, the fact that petitioner financed many of his own real estate developments does not result in a finding that petitioner was in a trade or business of lending money. Petitioner's financing endeavors were integral to his real estate *156 development. Petitioner was not in the general trade or business of lending money. Lastly, petitioner submits that a joint venture existed with SVH with respect to the Serene Lakes project. Although there may have been discussion between petitioner and his father with respect to forming a joint venture, the fact remains that a joint venture never materialized. As far as we can determine from the record, all the discussion remained at the preliminary stage. We have no evidence of decisions relating to capital contributions, the sharing of profits and losses, etc. While petitioner had a history of forming partnerships and other ventures with respect to real estate development, there is no evidence to support a finding that such a venture existed in this instance. See generally Hubert M. Luna,42 T.C. 1067 (1964); compare Beck Chemical Equipment Corporation,27 T.C. 840 (1957). We believe the record supports a finding that but *157 for the fact of petitioner's father's involvement, the loans would not have been made. While it is true that profit was the sole motive in making the loans, petitioner fails to acknowledge that it is his father's profit that is at stake, not his own. Although we can hypothesize that had the project become successful, it would be likely that petitioner might get a greater return than that of a mere lender, the fact remains that a joint venture never materialized. Consequently, we have no choice but to find that the debts resulting from the loans to petitioner's father and to SVH were nonbusiness bad debts deductible only under section 166(d). United States v. Generes,supra.
We turn now to the petitioner's losses resulting from his status as a guarantor, analyzing the guarantee of his father's $125,000 loan from the Crocker Bank first. Section 166(f) is the only applicable provision available which would allow an ordinary deduction. However, as petitioner has conceded on brief that he does not meet the requirements of that provision with respect to the $125,000 guarantee, we have no choice but to hold for respondent on this point. This loss, therefore, is *158 deductible as a loss resulting from a nonbusiness bad debt. With respect to payments as guarantor of the bond we reach a contrary conclusion. Respondent's only contention is that petitioner has not established that the debt upon which the guarantee was made was worthless. We disagree. Although the named principals on the bonds were petitioner's father and Patty, it is our opinion that, in substance, the only principal was petitioner's father, and it has been shown that his estate was insolvent. Petitioner did not have to demonstrate the insolvency of Patty's estate since the evidence clearly indicates that Patty was to be held harmless from any liability resulting from the bonds. Patty was a principal in name only, to comply with local law. Consequently, the liability fell upon petitioner when his father became insolvent, and in our judgment section 166(f) is applicable, all of its requirements having been met. With respect to the depreciation adjustments, we must sustain respondent's determinations. The burden of proof with respect to useful life is upon petitioner. Welch v. Helvering,290 U.S. 111 (1933); *159 Rule 142, Tax Court Rules of Practice and Procedure.Petitioner's unsubstantiated oral testimony as to the estimated useful lives of the buildings in issue is insufficient to carry his burden. The final issue presented concerns respondent's disallowance of $34,400 of HDC's bad debt deduction for its taxable year ending October 31, 1969. In our judgment respondent erred in this disallowance. Respondent's action in this regard is based upon the theory that the $34,400 receivable had no value when acquired by HDC and thus was already worthless. The evidence indicates that HDC agreed to take over petitioner's loan of $34,400 to SVH and in addition to loan SVH $100,000. In return SVH would execute a secured note to HDC for $134,400. There is nothing in the record to indicate that the $34,400 receivable was worthless when acquired by HDC. In fact, the record indicates that the entire $134,400 did not become worthless until sometime in HDC's taxable year ending October 31, 1969. Consequently, the entire $134,400 should have been allowed as a bad debt deduction, not just the $100,000. To reflect the various concessions and adjustments, Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Mr. and Mrs. Frank D. Patty 596 Winston Avenue San Marino, California
Dear Frank: RE: BONDS 582885 AND 582886, ISSUED BY GENERAL INSURANCE COMPANY OF AMERICA, SERENE LAKE SUBDIVISION UNIT #2 - 100 LOTS On or about May 7, 1967, you and your wife executed bonds and applications referred to above in the aggregate sum of $223,811. I am writing this letter to hold you and your wife harmless from any liability in connection with these bonds. I have posted a letter of credit, dated May 11, 1967, from Crocker-Citizens National Bank with General Insurance Company of America and in the event SVH Investments fails to install improvements in the above referenced subdivision, I will install same at no cost whatsoever to you. I will do so however, only if General Insurance Company of America makes demand on me to install said improvements. Sincerely yours, Richard C. Hunsaker On June 1, 1967, petitioner guaranteed his father's note in the amount of $125,000 in favor of Crocker-Citizens National Bank. This $125,000 was advanced by petitioner's father to SVH. Petitioner's father suffered a stroke in November 1968 which rendered him almost speechless until March 1969. Because of his father's incapacity, petitioner became a director of SVH in December 1968 and a vice president and chief operating officer in January 1969, thus taking "over the reins of his [father's] business." Petitioner never received a salary or fee for these services. During the summer of 1969 petitioner's father suffered another stroke and died in August 1969. His estate was insolvent. In 1969 petitioner paid Crocker-Citizens National Bank $125,000 as guarantor of his father's note. The amount was not collectible from his father or his estate. Petitioner's records reflect the following activity in "Accounts Receivable--S. V. Hunsaker, Sr." for the years 1968 and 1969: Charges
Credits
Balance
$330,500.00
1968
January 31
$ 5,000.00
January 31
15,000.00
350,500.00
March 31
19,400.00
369,900.00
April 30
13,525.00
383,425.00
May 31
$ 13,525.00
May 31
7,000.00
376,900.00
June 30
20,000.00
June 30
8,000.00
404,900.00
July 31
20,000.00
384,900.00
December 31
5,500.00
390,400.00
December 31
34,400.00
December 31
37,949.69
318,050.31
1969
$318,050.31
January 31
$318,050.31
0
January 31
957.06
(957.06)
February 28
$ 7,985.22
7,028.16
March 31
5,175.00
12,203.16
April 30
15,296.75
27,499.91
May 31
1,260.50
28,760.41
June 30
65.00
28,825.41
July 31
1,200.00
July 31
1,200.00
31,225.41
August 31
550.00
August 31
1,360.00
33,135.41
December 31
5,079.39
December 31
38,214.80
0 The amounts loaned by petitioner to his father were evidenced by unsecured promissory notes bearing eight percent interest. At the end of December 1968 petitioner's father owed him $390,400. Of this amount $318,050.31 was canceled by petitioner's purchase of certain secured notes and land contracts receivable owned by his father. Of the amounts advanced by petitioner to his father, $37,949.69 became uncollectible in 1968 and $38,214.80 became uncollectible in 1969. Petitioner's records reflect the following activity in "Accounts Receivable--S.V.H. Investments" for the years 1968 and 1969: Charges
Credits
Balance
1968
0
November 30
$10,000.00
$ 10,000.00
December 31
25,000.00
35,000.00
December 31
$ 35,000.00
0
1969
January 31
$25,000.00
$ 25,000.00
February 28
21,000.00
46,000.00
March 31
34,950.00
80,950.00
April 30
27,700.00
108,650.00
May 31
7,650.00
116,300.00
June 30
3,550.00
119,850.00
July 31
3,100.00
122,950.00
August 31
400.00
123,350.00
September 30
$ 4,300.00
September 30
6,775.00
$134,425.00
October 31
250.00
134,675.00
December 31
$ 3,100.00
131,575.00
December 31
131,575.00
0 The amounts loaned to SVH were also evidenced by unsecured promissory notes bearing eight percent interest. Any repayments by SVH to petitioner depended upon its success in land development. Of the amounts advanced to SVH by petitioner $35,000 became uncollectible in 1968 and $131,575 became uncollectible in 1969. Petitioner also advanced an additional $1,679 to SVH in 1969 and this amount also became uncollectible in 1969. On its tax returns SVH reported losses (before applying net operating loss carryforwards) and retained earnings (deficits) as follows: Retained Year
Gain/(Loss)
Earnings/(Deficits)
1965
($ 45,933.00)
($ 45,933.00)
1966
(322,688.09)
194,447.00
1967
(894,088.59)
(111,414.51)
1968
(544,468.11)
(180,640.15)
1969
(2,545,124.03)
(3,300,309.00)
1970
(150,273.62)
(3,715,986.00)
SVH carried the following amounts as loans from shareholders: Loans from Year
Shareholders
1965
$ 530,000
1966
1,546,000
1967
3,677,814
1968
3,677,814
1969
3,565,236
1970
3,571,433
Petitioner's father received the following amounts as salary from SVH: Year
Salary
1965
$ 7,500
1966
18,000
1967
18,000
1968
18,000 At his death he had made advances totaling over $3,500,000 to SVH. Although SVH had a book profit in 1966, it operated with a negative cash flow during each of the years 1965 through 1970. This weak financial position of SVH during the years in issue was due to a lack of working capital, a failure to maintain a strong sales operation and problems with environmental requirements relating to the development of Serene Lakes. It was the occurrence of his father's stroke that caused petitioner to become active in the Serene Lakes project on behalf of SVH. His purpose in taking over from his father was to protect his and his father's investments. The active involvement was clearly profit oriented. Although petitioner and his father had discussed the creation of a joint venture with respect to the Serene Lakes project, no joint venture was ever entered into. The Serene Lakes project became economically unfeasible and was eventually abandoned by SVH. On January 1, 1968, petitioner owned two notes receivable secured by second deeds of trust and 55 land contracts receivable with a total face value of $805,277.31. During 1968 he acquired one additional note secured by a deed of trust and one other note. $15,016.25 in principal and $52,638.49 in interest were collected during the year. On January 1, 1969, petitioner owned three notes receivable secured by second deeds of trust, 55 land contracts receivable and one additional note receivable with a total face value of $883,696.06. During the year 1969 he acquired the 86 notes from his father and another note receivable with a total face value of $1,155,305.63 so that his total portfolio of notes and land contracts receivable had a face value of $1,949,901.91. $375,747.25 in principal and $110,563.91 in interest were collected during the year. On January 1, 1970, petitioner owned three notes receivable secured by second deeds of trust, 121 land contracts and one other note receivable with a total face value of $1,663,254.44. $112,868.23 in principal and $108,154.14 in interest were collected during 1970. The contracts receivable and promissory notes secured by second trust deeds resulted mainly from the acceptance of negotiable instruments in exchange for part of the purchase price of houses built and sold by petitioner's various businesses. However, we also note, as previously stated, that $318,050.31 of these contracts were acquired from petitioner's father in 1968 which in effect canceled some of his debts to petitioner.
[3]↩
4. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Reserve for Bad Debts.--In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. (e) Worthless Securities.--This section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C). (f) Guarantor of Certain Noncorporate Obligations.--A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.↩
5. § 1.166-5 Nonbusiness debts. * * *
(b) Nonbusiness debt defined. For purposes of section 166 and this section, a nonbusiness debt is any debt other than-- (1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade or business of the taxpayer at the time when the debt becomes worthless; or (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The question whether a debt is a nonbusiness debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c)(1). For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. The use to which the borrowed funds are put by the debtor is of no consequence in making a determination under this paragraph. For purposes of section 166 and this section, a nonbusiness debt does not include a debt described in section 165(g)(2)(C)↩. See § 1.165-5, relating to losses on worthless securities.
6. In this regard we note that HDC also loaned funds to SVH. This factor, by itself, however, does not cause petitioner's loans to become business bad debts. The success or failure of HDC was not dependent upon SVH.↩