JOHN L. VIANI AND LISETTA L. VIANI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Viani v. Commissioner
Docket Nos. 7298-91, 16285-91
United States Tax Court
T.C. Memo 1994-471; 1994 Tax Ct. Memo LEXIS 479; 68 T.C.M. (CCH) 776; September 27, 1994, Filed *479 Decisions will be entered under Rule 155. For petitioners: Cyril L. Lawrence. For respondent: Debra K. Moe and Peter R. Hochman. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in, additions to, and accuracy-related penalty on petitioners' Federal income tax: Accuracy-Related
Additions to Tax
Penalty Year
Deficiency
Section 6661 [1] Section 6662
1981
651
--
--
1982
1,524
--
--
1984
9,335
2,334
--
1985
19,061
4,965
--
1986
64,687
16,172
--
1987
11,455
2,864
--
1988
39,295
$ 9,824
--
1989
$ 18,315
--
$ 3,663
We must decide the following issues: (1) Are petitioners entitled to deduct for 1987 any portion of their payment in respect of certain loans as either a bad debt under section 166, a loss under section 165, or an ordinary and necessary business expense under section 162? We hold that they are not. (2) Are petitioners entitled to bases for an almond *480 orchard and for certain farm equipment in excess of the bases for those items that were determined in the notices of deficiency? We hold that they are not. (3) Are petitioners entitled to deduct legal fees for 1987, 1988, and 1989 in the amounts of $ 11,000, $ 6,548, and $ 1,995, respectively? We hold that they are not. (4) Are interest expenses claimed by petitioners for 1987, 1988, and 1989 in the amounts of $ 35,272, $ 73,960, and $ 81,988, respectively, subject to the limitation of section 163(h)(5)? We hold that they are. (5) Are petitioners liable for 1984 through 1988 for additions to tax under section 6661 and for 1989 for the accuracy-related penalty under section 6662? We hold that they are not. FINDINGS OF FACT Some of the facts have been stipulated and are so found. [2]
*481 Petitioners John L. Viani (John Viani or petitioner) and Lisetta L. Viani (Lisetta Viani) resided in Merced, California, at the time the petitions were filed. Petitioner was born in Merced, California. When he was 10 years old, he moved to Italy where he completed about seven years of school. At the age of 17, he returned to the United States and attended night school for a couple months in order to learn to read and write English. John Viani has not had any other formal education in the United States. During 1930, John Viani began farming in Merced, California, by producing tomatoes. Beginning in 1947, John Viani and his brother, Charles Viani, jointly started producing almonds on a parcel of land known as Kibby Ranch, one-half of which was owned by them and one-half of which was owned by their parents until the two Viani brothers acquired full ownership of Kibby Ranch about 1948 or 1949. John and Charles Viani conducted their joint almond farming operation as a partnership known as Viani Brothers. In addition to farming almonds, Viani Brothers leased commercial property. During the years at issue, Viani Brothers owned a building located in Modesto, California, that was *482 leased and operated by Save-Mart (Save-Mart building) as a grocery store. Prior to his death on June 4, 1982, Charles Viani transferred his interest in Viani Brothers, Kibby Ranch, and the rest of his property to a revocable trust called the Charles Viani Living Trust (Charles Viani Trust). On the death of Charles Viani, the Charles Viani Trust became an irrevocable trust. Following Charles Viani's death, Viani Brothers continued in existence as a partnership with John Viani and the Charles Viani Trust as partners. When Charles Viani died, John Viani became the trustee and income beneficiary of the Charles Viani Trust. When John Viani dies, the assets of the Charles Viani Trust are to be divided into equal shares between Larry Viani and Lida Viani Palazzo (Lida Palazzo), petitioners' children. If either Larry Viani or Lida Palazzo is dead at the time the assets of the Charles Viani Trust are to be distributed, that deceased beneficiary's equal share to the assets of the Charles Viani Trust is to be distributed to that beneficiary's living lawful issue by right of representation. Form 1065 (U.S. Partnership Return of Income) filed by Viani Brothers for 1981 reflects total income *483 of $ 41,357 consisting of $ 41,279 in net rental income ($ 77,250 in gross rents minus $ 35,971 in rental expenses) and $ 78 in income received from the Merced Tomato Growers Trust (Tomato Trust). In that return, Viani Brothers reported $ 61,250 in rental income from its lease of the Save-Mart building and $ 16,000 in rental income from its lease of farm property. [3] Amounts from the Tomato Trust were from operations of Viani Brothers conducted prior to 1981. Form 1065 filed by Viani Brothers for 1982 reflects total income of $ 47,469 consisting of $ 47,423 in net rental income ($ 79,133 in gross rents minus $ 31,710 in rental expenses) and $ 46 in income received from the Tomato Trust. In that return, Viani Brothers reported $ 79,133 in rental income from its lease of the Save-Mart building and no rental income from its lease of farmland or farm equipment. Form 1065 filed by Viani *484 Brothers for 1983 reflects total income of $ 57,625 consisting of $ 57,597 in net rental income ($ 87,291 in gross rents minus $ 29,694 in rental expenses) and $ 28 in income received from the Tomato Trust. In that return, Viani Brothers reported $ 87,291 in rental income from its lease of the Save-Mart building and no rental income from its lease of farmland or farm equipment. Form 1065 filed by Viani Brothers for 1985 [4] reflects total income of $ 74,233 consisting solely of net rental income ($ 105,610 in gross rents minus $ 31,377 in rental expenses). In that return, Viani Brothers reported $ 105,610 in rental income from its lease of the Save-Mart building and no rental income from its lease of farmland or farm equipment. At the age of 15, Larry Viani, petitioner's son, began working in his father's farming operation. About 1980, Larry Viani started to farm on his own, operating under the name of Viani Farms. In a document Larry Viani filed on *485 October 19, 1984, with the Merced County Agricultural Stabilization and Conservation Service of the United States Department of Agriculture, Larry Viani described Viani Farms as a sole proprietorship, and not as a partnership. He continued to farm through 1987. During that year, Larry Viani also worked for his father and received a Form W-2 for wages paid to him by his father. About 1982, Larry Viani had three employees to help him and paid others on a "contract work" basis to help in the harvesting of his crops. During 1980 and 1981, Larry Viani farmed cotton and almonds. During 1982 through 1987, Larry Viani grew, among other crops, alfalfa, cotton, wheat, corn, and almonds. In order to begin farming on his own, Larry Viani borrowed in 1980 approximately $ 80,000 from Farmers Home Administration (FmHA), having used as collateral the amount of equity (viz., approximately $ 10,000 to $ 15,000) he had in his personal residence. Beginning on January 1, 1980, Larry Viani leased from Charles Viani and John Viani the Kibby Ranch and "all ranch, farm and orchard machinery and equipment" located on that farm. The term of the lease of Kibby Ranch was one year and was automatically *486 renewable on a year-to-year basis after the first year ended, unless either the lessors or lessee expressly terminated the lease by written notice. At no time during the years pertinent to these cases did either the lessors John Viani and Charles Viani or the lessee Larry Viani give written notice to terminate the lease of Kibby Ranch as would have been required under the lease agreement in the event the lease were to be terminated. Larry Viani paid rent in 1981 for his use of Kibby Ranch. [5]
Beginning on January 1, 1980, Larry Viani leased from John Viani the Arboleda Ranch on which almonds were cultivated and "all ranch, farm and orchard machinery and equipment" located on that farm. The term of the lease of Arboleda Ranch was one year and was automatically renewable on a year-to-year basis after the first year ended, unless either the lessor or lessee expressly terminated the lease by written notice. *487 At no time during the years pertinent to these cases did either the lessor John Viani or the lessee Larry Viani give written notice to terminate the lease of Arboleda Ranch as would have been required under the lease agreement in the event the lease were to be terminated. Larry Viani paid rent in 1981 for his use of Arboleda Ranch. [6] Larry Viani stopped paying rent to his father for the use of Arboleda Ranch after 1981. Effective October 1, 1981, Larry Viani leased additional farmland on a one-year basis from James Munday and from Roberta Flanagan. Starting on November 1, 1982, after the expiration of the one-year term of each of those leases, Larry Viani leased a 1,510-acre alfalfa field from New Stone Corporation. To pay for expenses related to his farming, Larry Viani approached Bank of America (Bank) around the summer of 1982 in order to inquire about borrowing money. The Bank informed Larry *488 Viani that it would require him to have a guarantor since he lacked sufficient assets that could serve as collateral for the amounts he wished to borrow. In the summer or fall of 1982, Larry Viani asked his parents to serve as guarantors. Petitioners loved their son and wanted him to succeed in farming. They therefore agreed to guarantee any loans their son obtained from the Bank. Petitioners first signed a loan guarantee (loan guarantee) on behalf of their son on January 14, 1983. As Larry Viani began to borrow greater amounts from the Bank during years after 1982, the Bank asked petitioners to sign loan guarantees in increasing amounts to ensure that his debts to the Bank were fully covered. Petitioners signed three separate loan guarantees on the following dates, each of which superseded the preceding loan guarantee and under which they agreed to guarantee Larry Viani's loans from the Bank to the extent of the maximum amounts indicated: Maximum Amount
Date Signed
of Guarantee
01/14/83
$ 1,300,000
11/22/83
2,000,000
11/30/84
2,500,000
Each of the three loan guarantees was "a continuing guarantee relating to any indebtedness [of Larry Viani], including that *489 arising under successive transactions which shall either continue the indebtedness or from time to time renew it after it has been satisfied." The maximum amount of each loan guarantee was calculated to cover all principal amounts lent or to be advanced by the Bank to Larry Viani as of the date of the execution of each such guarantee as well as interest payments related thereto. Prior to signing the first loan guarantee in early January 1983, petitioners had never lent their son any money or guaranteed any of his debts. Petitioners would not have agreed to the loan guarantees that they undertook on behalf of their son for anyone else. At the time petitioners signed the three loan guarantees, Lisetta Viani was unaware of the amounts of those guarantees. Petitioners' dominant motivation in signing each of those guarantees was personal. The loan guarantees signed by petitioners covered at least four loan agreements executed by Larry Viani that were numbered 371, 684, 789, and 906. Specifically, on November 22, 1983, Larry Viani executed loan No. 371 and used the borrowed funds to pay off an earlier loan he had with the Bank and to purchase farm equipment. The equipment purchased *490 served as collateral for that loan. Under the terms of loan No. 371 (equipment loan), Larry Viani (1) was permitted to borrow up to $ 180,000, (2) was to pay quarterly interest at the rate of 13.55 percent commencing on January 15, 1984, and (3) was to pay any unpaid principal amount, together with unpaid interest thereon, on demand, or if no demand was made, on December 31, 1984. Larry Viani did not pay off this loan on its due date. On July 25, 1984, Larry Viani executed loan No. 684 in the principal amount of $ 349,485.55. The borrowed funds were supposed to have been used to pay expenses he had incurred while farming during 1982 and 1983. [7] Under the terms of loan No. 684 (1982/83 crop line), Larry Viani (1) was to pay quarterly interest at the rate of 14 percent commencing on October 15, 1984, and (2) was to pay any unpaid principal amount, together with unpaid interest thereon, on demand, or if no demand was made, on January 1, 1985. Larry Viani did not pay off this loan on its due date. *491 On November 30, 1984, Larry Viani executed loan No. 789. He was to use the borrowed funds to pay expenses he projected he would incur while farming during 1985. Under the terms of loan No. 789 (1985 crop line), Larry Viani (1) was permitted to borrow up to $ 811,852, (2) was to pay quarterly interest at the rate of 14.25 percent commencing April 1, 1985, and (3) was to pay any unpaid principal amount, together with unpaid interest thereon, on demand, or if no demand was made, on January 1, 1986. Modifications to the principal amount, the calculation of interest, and the date of the payment of interest for the 1985 crop line were provided in loan agreements executed by Larry Viani on July 9, 1985, and November 18, 1985. Larry Viani did not pay off this loan on its due date. On February 7, 1985, Larry Viani executed loan No. 906 in the principal amount of $ 587,439.54. The borrowed funds were supposed to have been used to pay expenses he had incurred while farming during 1984. [8] Under the terms of loan No. 906 (1984 crop line), Larry Viani (1) was to pay quarterly interest at the rate of 2.5 percent greater than the interest rate set by the Bank as its "reference rate" commencing *492 on April 1, 1985, and (2) was to pay any unpaid principal amount, together with unpaid interest thereon, on demand, or if no demand was made, on January 1, 1986. Larry Viani did not pay off this loan on its due date. In 1980, the almond trees on Kibby Ranch were approximately 40 years old. The productive life of an almond tree generally ranges from approximately 25 years to 40 years. When originally planted, the Kibby Ranch almond orchard contained about 70 to 75 trees per acre. By 1980, the number of almond trees per acre on Kibby Ranch had dropped to approximately 45 trees per acre due to diseased trees and inclement weather. Sometime *493 around June 1981, John Viani, Charles Viani, and Larry Viani arrived at an agreement that Larry Viani would undertake renovating or replanting the almond orchard on Kibby Ranch as soon as the almond production on that land reached such low levels that the almond crop was not worthwhile. This occurred during the 1981 almond crop season. By 1982, approximately one-half of the almond trees on Kibby Ranch had died due to disease and inclement weather. Larry Viani began removing the remaining almond trees from Kibby Ranch during October 1982. By December 1982, Larry Viani had cleared 50 acres of almond trees from Kibby Ranch. Larry Viani removed the balance of the trees from Kibby Ranch in the fall of 1983 and replanted almond trees during February 1984. The expenses incurred during 1982, 1983, and 1984 to remove the almond trees from Kibby Ranch and to replant almond trees on that farm were paid by Larry Viani from his then existing crop lines of credit with the Bank. At the time Larry Viani incurred those expenses, John Viani paid none of them. In the Schedule F (Farm Income and Expenses) attached to the joint Federal income tax return Larry Viani filed with his wife Linda Viani *494 for 1983, Larry Viani claimed deductions relating to farming and reported income from his sale of old, diseased trees removed from Kibby Ranch. [9] In Schedules F attached to the joint Federal income tax returns he filed with his wife for 1984, 1985, 1986, and 1987, Larry Viani claimed deductions relating to farming, including depreciation deductions relating to his planting of almond trees during 1984. At the time Larry Viani began to remove the almond trees from Kibby Ranch, the Bank did not realize that Larry Viani was using money from his crop lines of credit to pay for the removal and replanting of almond trees on Kibby Ranch. It was the policy of the Bank not to permit the use of short-term crop lines to fund long-term capital investments, including the planting of an orchard. By July 1983, the Bank became aware that Larry Viani was diverting money from his crop lines to pay *495 for the removal and replanting of almond trees on Kibby Ranch. As of that time, the Bank estimated that the cost to Larry Viani of removing almond trees from Kibby Ranch was between $ 55,000 to $ 65,000 and that he had purchased about $ 8,000 of new almond trees. Larry Viani subsequently informed the Bank that he had spent $ 90,000 on replanting the Kibby Ranch almond orchard. At about the time in 1983 that the Bank became aware that Larry Viani was diverting money from his crop lines to pay for the removal and replanting of almond trees on Kibby Ranch, both John Viani and Larry Viani had advised the Bank, and thereafter continued to advise the Bank, that Larry Viani was going to inherit Kibby Ranch in the near future. Based on this representation, the Bank believed in March 1984 that a loan that was to cover Larry Viani's costs in replanting an almond orchard on Kibby Ranch and that was to be secured by Larry Viani's ownership interest in Kibby Ranch and the replanted almond orchard thereon would be executed by Larry Viani, in the name of Viani Farms. Larry Viani was unable to repay his crop lines for 1982, 1983, and 1984, resulting in crop loan carryovers. The Bank attributed *496 Larry Viani's inability to repay those credit lines in large part to low commodity prices in 1982, 1983, and 1984 and Larry Viani's inability to monitor and control his farming expenses during those years. In addition, Larry Viani's use of moneys from his crop lines to pay expenses associated with his replanting of the Kibby Ranch almond orchard helped cause his crop loan carryovers. As a result of Larry Viani's crop loan carryovers, the Bank informed Larry Viani in September 1984 that it would not lend him additional funds to pay the expenses he projected he would incur while farming during 1985. Upon learning of the Bank's decision, John Viani requested the Bank to continue providing financing to Larry Viani. The Bank strongly advised John Viani not to support his son's farming activities because it believed that the continued financing of Larry Viani's farming activities was "throwing good money after bad." Nonetheless, John Viani wanted and chose to do so. At the insistence of John Viani and Larry Viani, the Bank prepared a budget for Viani Farms for 1985. The budget projected that Viani Farms would make a profit of approximately $ 150,000. Based on that projection, the *497 Bank agreed to lend Larry Viani money to finance his farming operation for 1985. In agreeing to extend funds to Larry Viani under the 1985 crop line, the Bank required, among other things, that John Viani (1) pay $ 100,000 toward reducing Larry Viani's outstanding debt to the Bank; (2) sign a $ 90,000 loan agreement (loan No. 788) on November 30, 1984, to cover Larry Viani's use of his crop lines to pay for replanting the almond orchard on Kibby Ranch (almond orchard development loan); [10] and (3) personally supervise purchases and expenditures associated with Larry Viani's farming activities. On December 28, 1984, John Viani paid the Bank the $ 100,000 he was required to pay as a condition for its decision to extend Larry Viani the 1985 crop line. John Viani's attorney Cyril Lawrence (Mr. Lawrence), who is also counsel for petitioners in these cases, requested that the Bank credit the *498 entire $ 100,000 payment toward prepaid interest to enable John Viani to claim an interest deduction in that amount for 1984. The Bank instead agreed to recognize $ 84,000 of the $ 100,000 payment by John Viani as prepaid interest. In a letter to the Bank dated December 28, 1984, Mr. Lawrence also requested, for certain unidentified "personal reasons" of John Viani, that the Bank make John Viani a co-obligor on all of Larry Viani's outstanding crop lines. The Bank agreed. In agreeing to allow John Viani to become a co-obligor on Larry Viani's crop lines, the Bank realized that Larry Viani did not have the financial capacity to pay the crop lines, that John Viani had assets that could be used to pay those crop lines, and that it could proceed directly against John Viani for collection of the entire debt outstanding under those crop lines. Consequently, on or about December 28, 1984, John Viani became co-obligated with Larry Viani on the 1982/83 crop line, the 1984 crop line, and the 1985 crop line. In becoming a co-obligor on those three crop lines, John Viani's liability to the Bank was joint and several with that of his son. John Viani did not become co-obligated on the equipment *499 loan. The loan guarantee petitioner and Lisetta Viani had executed on November 30, 1984, remained in effect after petitioner became co-obligated on his son's crop lines with the Bank. At the time John Viani became a co-obligor on Larry Viani's three crop lines with the Bank, both John Viani and Larry Viani were aware that Larry Viani did not have the ability to pay his debts to the Bank, and John Viani had sufficient assets that could be liquidated to pay Larry Viani's crops lines. In the fall of 1985, despite a request from Larry Viani and John Viani, the Bank decided not to extend funds to Larry Viani to cover farming expenses he anticipated for 1986. Following that decision of the Bank, petitioners, through Mr. Lawrence, entered into negotiations with the Bank for the purpose of reaching a settlement relating to payment of the debts owed to the Bank. As of October 30, 1986, the Bank listed the following amounts as outstanding under the various loan agreements signed by John Viani and/or Larry Viani: John Viani's
Status Under The
Loan
Loan Amount Loan Agreements 1982/83 crop line
$   222,748.31
Co-obligor
1984 crop line
441,128.92
Co-obligor
1985 crop line
154,895.57
Co-obligor
Equipment loan
160,696.32
Guarantor
Almond orchard development loan
90,000.00
Obligor
Total
$ 1,069,469.12
*500 Petitioner Lisetta Viani also was a guarantor on the equipment loan. Pursuant to the loan guarantee signed on November 30, 1984, petitioners also were guarantors on the 1982/83, 1984, and 1985 crop lines. As part of the settlement negotiations, the Bank charged off $ 104,000 of the principal owed under the 1982/83 crop line. During the course of those settlement negotiations, John Viani failed to notify the Bank of certain cash deposits, stock, and rental property that he owned. Moreover, the Bank became aware that crop proceeds generated under the name of Viani Farms were not being forwarded to the Bank as Larry Viani had agreed to do. After over a year of negotiations, on January 19, 1987, a settlement document (settlement document) was signed by petitioners, Larry Viani, Linda Viani, and the Bank. Under the terms of the settlement document, petitioners were required to transfer to the Bank either clear title to three parcels of real property, including Kibby Ranch and Arboleda Ranch, or cash aggregating $ 776,025. In addition, the settlement document provided for the transfer of certain farm equipment to the Bank. In lieu of receiving that equipment, the Bank agreed to *501 accept $ 68,500 in cash. On May 29, 1987, petitioners paid $ 883,600 to the Bank in settlement of the amounts owed under (1) the 1982/83, 1984, and 1985 crop lines signed by John Viani and Larry Viani as co-obligors and guaranteed by petitioners, (2) the equipment loan signed by Larry Viani and guaranteed by petitioners, and (3) the almond orchard development loan signed by John Viani as a condition to the Bank's providing Larry Viani with funds under the 1985 crop line. [11] *502 In order to make that payment to the Bank, petitioners borrowed the following amounts from the lenders indicated: Lending Institution
Amount Hancock Money
$ 222,235
Federal Land Bank
591,865
Wells Fargo Bank
68,500
Total
[12] $ 882,600
After making the $ 883,600 payment to the Bank, John Viani acquired ownership to the farm equipment described in the settlement document. On April 24, 1989, Larry and his wife Linda Viani filed a petition in the U.S. Bankruptcy Court under chapter 7 (bankruptcy petition). In a question in the bankruptcy petition requiring Larry Viani to list partners, joint venturers, and other associates with whom he conducted business during the six years immediately preceding the filing of that petition, Larry Viani did not list his father John Viani or his mother Lisetta Viani (or anyone else) as either a partner, joint venturer, or other associate of his and did not describe Viani Farms as being a partnership during that six-year period. In a schedule of unsecured creditors attached to the bankruptcy petition, John and Lisetta Viani are listed as co-signors on a FmHA *503 loan, for which the amount of their claim against the bankruptcy estate of Larry and Linda Viani is listed as $ 0. John and Lisetta Viani are not listed as creditors in any other capacity in the bankruptcy petition. Petitioners did not make a claim against their son Larry Viani in the bankruptcy case that he and his wife initiated in April 1989. Petitioners never asked their son to repay the $ 883,600 they paid to the Bank in 1987 in settlement of the debts owed to the Bank. Petitioners filed joint Federal income tax returns for 1981 through 1989. Petitioners filed Forms 1045 (Application for Tentative Refund) for 1981, 1982, 1984, and 1985. Petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 1986. [13] All of those returns were prepared by someone in the office of petitioners' accountant Robert Davis (Mr. Davis) and were reviewed and signed by Mr. Davis as return preparer. Although petitioners reviewed their returns after Mr. Davis had them prepared and before they signed them, petitioners, who were unfamiliar with the tax laws, did not fully understand their returns for the years at issue. Petitioners were unable to determine mistakes in the returns *504 prepared by Mr. Davis' office and relied on Mr. Davis to prepare their returns correctly. In the joint Federal income tax return petitioners filed for 1981 (1981 return), John Viani listed his occupation as a farmer. In Schedule E (Supplemental Income Schedule) attached to the 1981 return, petitioners reported $ 17,000 in rental income from farmland and equipment located in Merced, California, and a net profit from that activity of $ 7,081. In that same schedule, petitioners reported $ 20,678 in income from Viani Brothers and $ 2,964 in income from the Luigi Bandoni Trust (Bandoni Trust) and the Tomato Trust. In Schedule F attached to the 1981 return, petitioners reported $ 13 in farm income, no farm deductions, and $ 13 as a net farm profit. In the joint Federal income tax return petitioners filed for 1982 (1982 return), John Viani listed his occupation as retired. In Schedule E attached to the 1982 return, petitioners reported no income *505 from the renting of farmland or equipment and a net loss from that activity of $ 6,946 attributable to claimed deductions for depreciation, insurance, property taxes, contract labor, and water. In that same schedule, petitioners reported $ 23,734 in income from Viani Brothers and $ 21,223 in income from the Charles Viani Trust, the Bandoni Trust, the Tomato Trust, and the estate of Margherita Viani (Margherita Viani Estate). No Schedule F was attached to the 1982 return. In the joint Federal income tax return petitioners filed for 1983 (1983 return), John Viani listed his occupation as retired. In Schedule E attached to the 1983 return, petitioners reported no income from the renting of farmland or equipment and a net loss from that activity of $ 19,019 attributable to claimed deductions for depreciation, property taxes, contract labor, and repairs. In that same schedule, petitioners reported $ 28,813 in income from Viani Brothers and $ 17,337 in income from the Charles Viani Trust, the Bandoni Trust, the Margherita Viani Estate, and the Tomato Trust. No Schedule F was attached to the 1983 return. In the joint Federal income tax return petitioners filed for 1984 (1984 return), *506 John Viani listed his occupation as retired. In Schedule E attached to the 1984 return, petitioners reported no income from the renting of farmland or equipment and a net loss from that activity of $ 100,482 attributable to claimed deductions for depreciation, property taxes, contract labor, repairs, water, interest, and supplies. The interest expense deduction claimed in that schedule included $ 84,000, which was a portion of the $ 100,000 paid to the Bank in 1984 as a condition to the Bank's agreeing to extend Larry Viani the 1985 crop line. Petitioners also reported in that same schedule $ 30,208 in income from Viani Brothers and $ 80,966 in income from the estate of Charles Viani, the Charles Viani Trust, the Bandoni Trust, the Margherita Viani Estate, and the Tomato Trust. No Schedule F was attached to the 1984 return. In the joint Federal income tax return petitioners filed for 1985 (1985 return), John Viani listed his occupation as retired. In Schedule E attached to the 1985 return, petitioners reported $ 5,586 in income from the renting of farmland and equipment and a net loss from that activity of $ 50,566 attributable to claimed deductions for depreciation, property *507 taxes, contract labor, repairs, water, interest, supplies, licenses, insurance, dues and subscriptions, and leveling. In that same schedule, petitioners reported $ 37,117 in income from Viani Brothers and $ 55,513 in income from the Charles Viani Trust, the Bandoni Trust, and the Margherita Viani Estate. No Schedule F was attached to the 1985 return. In the joint Federal income tax return petitioners filed for 1986 (1986 return), John Viani listed his occupation as retired. In Schedule E attached to the 1986 return, petitioners reported $ 109,923 in income from partnerships, estates, and trusts, of which $ 44,874 was from Viani Brothers and the remainder of which was from the Charles Viani Trust, the Bandoni Trust, and the Margherita Viani Estate. In Schedule F attached to the 1986 return, petitioners reported $ 291,965 in farm income, $ 253,197 in farm deductions, and $ 38,768 as a net farm profit. In the Schedule F attached to the amended tax return petitioners filed for 1986, they reported $ 291,965 in farm income, $ 253,197 in farm deductions, and $ 57,172 as a net farm profit. In both instances, $ 445 of the $ 291,965 in reported farm income was described as attributable *508 to equipment rentals. In the joint Federal income tax return petitioners filed for 1987 (1987 return), John Viani listed his occupation as a farmer. In Schedule E attached to the 1987 return, petitioners reported $ 92,316 in income from partnerships, estates, and trusts, of which $ 42,618 was described as passive income from Viani Brothers and the remainder of which was described as passive income from the Charles Viani Trust, the Bandoni Trust, and the Margherita Viani Estate. In Schedule F attached to the 1987 return (1987 Schedule F), petitioners reported $ 125,372 in farm income, $ 896,034 in farm deductions, and $ 770,662 as a net farm loss. [14] Of the $ 125,372 in reported farm income, $ 13,908 was described as attributable to equipment rentals. Of the $ 896,034 in reported farm deductions, $ 667,328 was described as attributable to a business bad debt. [15] The $ 896,034 in farm deductions also reflected petitioners' claim of (1) depreciation relating to the Kibby Ranch almond orchard based on a basis for that property of $ 112,500, (2) depreciation relating to the farm equipment John Viani acquired after he settled the debts owed the Bank based on a basis for that equipment *509 of $ 65,500, [16] and (3) an interest expense of $ 35,272. Mr. Davis added a separate page to petitioners' 1987 return, entitled "Federal Footnotes" (disclosure *510 statement), that stated as follows: Statement A Schedule F business bad debt Farm loan guarantees paid off by taxpayer. Right of subrogation expired. Debtor taxpayer insolvent. Taxpayer paid to protect trade or business of farming.
When drafting the disclosure statement, Mr. Davis knew that John Viani was a co-obligor on some of Larry Viani's loans with the Bank. In determining whether petitioners could claim the bad debt deduction reflected in the 1987 return, Mr. Davis consulted with his accounting partner. He also requested an opinion from Mr. Lawrence. In a letter addressed to petitioners, a copy of which Mr. Davis received, Mr. Lawrence concluded that "John and Lisetta Viani in the opinion of this office have a business bad debt in an amount equal to the payment to [the] Bank * * * during 1987 representing a worthless debt between John and Larry Viani." In that legal opinion, Mr. Lawrence noted that the "original guarantee [in January 1983] was part of John [Viani]'s withdrawal from farming, and the takeover of his farming obligation by his son." In the joint Federal income tax return petitioners filed for 1988 (1988 return), John Viani listed his occupation *511 as a farmer. In Schedule E attached to the 1988 return, petitioners reported $ 77,568 in income from partnerships, estates, and trusts, of which $ 37,083 was described as passive income from Viani Brothers and the remainder of which was described as passive income from the Charles Viani Trust, the Bandoni Trust, and the Margherita Viani Estate. In the 1988 return, Viani Brothers was described as a passive partnership, and the Charles Viani Trust, the Bandoni Trust, and the Margherita Viani Estate were described as passive estates or trusts. In Schedule F attached to the 1988 return, petitioners reported $ 278,945 in farm income, $ 340,959 in farm deductions, and $ 62,014 as a net farm loss. Of the $ 340,959 in farm deductions, $ 75,479 was claimed as a mortgage interest expense paid to banks. In the joint Federal income tax return petitioners filed for 1989 (1989 return), John Viani listed his occupation as a farmer. In Schedule E attached to the 1989 return, petitioners reported $ 39,414 in income from partnerships, estates, and trusts, of which $ 17,724 was described as passive income from Viani Brothers and the remainder of which was described as passive income from the Charles *512 Viani Trust, the Bandoni Trust, and the Margherita Viani Estate. In the 1989 return, Viani Brothers was described as a passive partnership, and the Charles Viani Trust, the Bandoni Trust, and the Margherita Viani Estate were described as passive estates or trusts. In Schedule F attached to the 1989 return, petitioners reported $ 243,113 in farm income, $ 327,186 in farm deductions, and $ 84,073 as a net farm loss. Of the $ 327,186 in farm deductions, $ 81,998 was claimed as a mortgage interest expense paid to banks. Two notices of deficiency were sent to petitioners. The first notice covered 1981 through 1988, excluding 1983; the second notice covered 1989. In the notice of deficiency relating to, inter alia, 1987 (1987 notice), respondent disallowed petitioners' claimed $ 667,328 business bad debt. That notice also provided: On the alternative position the issue and facts are the same as the primary position. However, the Government position is that the the [sic] bad debt is a non-business bad debt. The repayment of the loan qualifies for a short term capital loss.
OPINION Burden of Proof
Petitioners bear the burden of proving that the determinations in *513 the notices of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). They have attempted to satisfy their burden through documentary evidence and their testimony and that of Larry Viani, Mr. Davis, and their expert witness Wesley Asai (Mr. Asai), a farm adviser and teacher connected with the Cooperative Extension Service of the University of California at Davis, California. As for the testimony of petitioners, the Court found that each had serious deficiencies in his or her ability to remember certain facts and events that transpired during the years at issue, in large part presumably because of their advanced ages. Consequently, the Court has considerable concern as to whether, when John Viani or Lisetta Viani was testifying, either was accurately stating the facts. Moreover, John Viani often did not hear the questions asked, and thus we are not confident whether he was responding to those questions or to what he understood the questions to be. In addition, John Viani at times changed his answers to questions asked. Further, although John Viani was able to recollect in detail certain matters that were favorable to *514 the positions asserted by petitioners herein, he had difficulty in remembering details about certain other matters that were unfavorable to those positions, even though both types of matters occurred at about the same times. As for the testimony of Larry Viani, having had the opportunity to observe his demeanor, the Court did not find his testimony to be credible in certain material respects. It is also noteworthy that, as far as Bank officials were concerned, John Viani and Larry Viani were not altogether truthful in representations they made to the Bank during years pertinent to these cases. Under the circumstances presented here, we are not required to, and do not, accept or rely on the self-serving testimony of petitioners or the testimony of their son Larry Viani in resolving the issues in these cases. See Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). *515 Nonbusiness Bad Debt Deduction
In her trial memorandum, her opening statement at trial, and her briefs, respondent not only argues that petitioners are not entitled to a business bad debt deduction for 1987 as a result of their payment to the Bank during that year, she also contends that petitioners are not entitled to nonbusiness bad debt treatment (i.e., a short-term capital loss) with respect to that payment. Respondent's position is a reversal of the alternative position she set forth in the 1987 notice. There, respondent stated: On the alternative position the issue and facts are the same as the primary position. However, the Government position is that the the [sic] bad debt is a non-business bad debt. The repayment of the loan qualifies for a short term capital loss.
Petitioners do not disagree with the position of respondent relating to nonbusiness bad debt treatment as set forth in her trial memorandum, her opening statement at trial, and her briefs. We assume this is because in the petition filed in docket No. 7298-91, which covers 1987, petitioners specifically allege that they are not entitled to a nonbusiness bad debt deduction. Both parties agree *516 that petitioners are not entitled to a nonbusiness bad debt deduction for 1987. There being no dispute about that matter, we shall not address it herein. [17]
Petitioners' Claim to a Deduction of $ 667,328 for 1987
In their 1987 return, petitioners claimed a business bad debt deduction in the amount of $ 667,328 relating to their payment of $ 883,600 to the Bank. On brief, petitioners changed their position. They now contend *517 that, of the $ 667,328 originally claimed in their 1987 return as a business bad debt, (1) the portion paid to the Bank in 1987 in respect of their guarantee of their son's equipment loan is a business bad debt under section 166, and (2) the portion paid to the Bank in 1987 in respect of the 1982/83, 1984, and 1985 crop lines (on which John Viani was co-obligor and petitioners were guarantors) is deductible either as a loss from a transaction entered into for profit under section 165 or an ordinary and necessary business expense under section 162. [18]
The Equipment Loan
Section 166(a) provides, inter alia, that a deduction is to be allowed for any debt which becomes wholly worthless during the taxable year. However, section 166(d) provides that, in the case of a taxpayer other than a corporation, *518 section 166(a) does not apply to any nonbusiness debt. Instead, if a nonbusiness debt becomes worthless during the taxable year, the loss resulting therefrom is to be treated as a short-term capital loss. Sec. 166(d)(1). Section 166(d)(2) defines a nonbusiness debt to mean a debt other than (1) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer, or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Whether a debt is a business or nonbusiness debt is a question of fact. Sec. 1.166-5(b), Income Tax Regs.
To be entitled to a business bad debt deduction, the taxpayer must establish that (1) he is engaged in a trade or business, and (2) the bad debt is proximately related to the conduct of that trade or business. Harsha v. United States, 590 F.2d 884, 886 (10th Cir. 1979); see sec. 1.166-5(b), Income Tax Regs. In United States v. Generes, 405 U.S. 93 (1972), the Supreme Court enunciated the test for determining whether a particular debt is proximately related to a taxpayer's trade or business in a factual setting where *519 that taxpayer appeared to have two possible motives for agreeing to indemnify the debts of a corporation of which he was both a stockholder and an employee. The Court stated: in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and * * * only significant motivation is not sufficient. * * * [Id. at 103.]
In determining the dominant motivation of a taxpayer for purposes of section 166, objective facts, rather than subjective intent, control. Harsha v. United States, supra at 886. When a guarantor pays a debt he or she has guaranteed, that debt is preserved, with the guarantor being substituted for the original creditor. Putnam v. Commissioner, 352 U.S. 82, 88 (1956). The debtor is usually not able to reimburse the guarantor, and in such cases the value of the debt is lost at the instant the guarantor pays the original creditor. Putnam v. Commissioner, supra at 89. Thus, *520 the instant the guarantor is substituted for the original creditor by payment on the guarantee, and thereby acquires the debt, is also the instant the debt becomes worthless in the guarantor's hands. Id. Whether the taxpayer's payment pursuant to his or her guarantee gives rise to a business or nonbusiness bad debt deduction is based upon the taxpayer's motive at the time he or she agreed to guarantee the debt of the third party. French v. United States, 487 F.2d 1246, 1248-1249 (1st Cir. 1973); see United States v. Generes, supra at 104; Benak v. Commissioner, 77 T.C. 1213, 1216-1217(1981); Gillespie v. Commissioner, 54 T.C. 1025, 1032 (1970), affd. 30 AFTR2d 72-5574, 72-2 USTC par. 9742 (9th Cir. 1972). On November 30, 1984, petitioners guaranteed, inter alia, Larry Viani's equipment loan; [19] neither petitioner was a co-obligor on that loan. Petitioners argue that their guarantee of the equipment loan was proximately related to John Viani's conducting a farming business, a rental business, or a combination *521 of both. Respondent argues that (1) petitioners were not engaged in any trade or business at the time they guaranteed the equipment loan and therefore their guarantee was not related to any trade or business of petitioners, and (2) assuming arguendo petitioners were engaged in a trade or business at the time they guaranteed their son's equipment loan, their dominant motive at that time was personal and therefore not proximately related to any such trade or business. Assuming arguendo that petitioners were engaged in a trade or business at the time in 1984 they guaranteed their son's equipment loan (and other Bank loans), we have found as a fact that petitioners' dominant motive in guaranteeing that and other Bank loans was personal. Petitioners loved their son, wanted him to succeed in farming, and, consequently, guaranteed his equipment loan (and other Bank loans). Petitioners would not have agreed *522 to the loan guarantees that they undertook on behalf of their son for anyone else. On the instant record, we are not persuaded that petitioners' dominant motivation in guaranteeing up to $ 2,500,000 of their son's debts to the Bank was other than their love for their son and their desire to have him succeed in farming and thereby carry on the successful farming tradition that John Viani and his brother Charles Viani had begun decades ago. We are persuaded, however, that, had petitioners' dominant motive been related to a business of John Viani, as petitioners contend, petitioners would not have guaranteed up to $ 2,500,000 of their son's Bank debts solely in return for his agreement to remove and replant the almond orchard on Kibby Ranch, which, on the instant record, we cannot find cost Larry Viani more than $ 90,000. [20]
Based on the entire record, we find that petitioners' November 30, 1984 guarantee of their son's *523 equipment loan (and other Bank loans) was not proximately related to any trade or business in which they contend John Viani was engaged at the time of such guarantee. See United States v. Generes, supra at 103-104; Harsha v. United States, supra at 886. To complete our response to all of petitioners' arguments, however, we shall turn to their contention that, when petitioners guaranteed their son's equipment loan (and other Bank loans) on November 30, 1984, John Viani was engaged in a farming business, a rental business, or a combination of both. With respect to petitioners' contention that John Viani was in the business of farming on November 30, 1984, we note first that petitioners' 1984 return belies any such contention. No Schedule F in which a taxpayer reports his or her farm income and expenses was attached to the 1984 return, and that return indicated that John Viani was retired. [21] We consider petitioners' return for 1984 to be an admission by them that John Viani was not in the business of farming during 1984, the year in which petitioners guaranteed Larry Viani's equipment loan (and other loans) to *524 the Bank. Times Tribune Co. v. Commissioner, 20 T.C. 449, 452 (1953); see McShain v. Commissioner, 71 T.C. 998, 1010 (1979). Petitioners ask the Court (1) to disregard their return for 1984 (as well as their returns for 1982, 1983, and 1985), alleging that that return (as well as the other returns) were wrong in stating that John Viani was retired and in not attaching Schedules F, and (2) to rely on the testimony of John Viani and others that they contend establishes that John Viani was engaged in the farming business at the time in 1984 petitioners guaranteed their son's equipment loan (and other Bank loans). On the present record, we refuse to do either. Before turning to the testimony on which petitioners rely, we note that John Viani began farming in 1930. Assuming arguendo that John *525 Viani, his wife, and his son sincerely believe that John Viani was and has remained a "farmer" since that time, even a sincere belief that John Viani was a "farmer" during the years at issue does not necessarily mean that, for Federal tax purposes, he was engaged in the trade or business of farming. Turning now to the testimony on which petitioners rely, we disagree with petitioners that that evidence establishes that John Viani was in the farming business in 1984 (or in 1982, 1983, and 1985). We find the testimony of petitioner John Viani, petitioner Lisetta Viani, their son Larry Viani, and their accountant Mr. Davis relating to petitioner's alleged conduct of a farming business to be general, vague, and/or conclusory. Their testimony lacked sufficient detail regarding the nature, purpose, regularity, and continuity of the farming activities in which John Viani was alleged to have been engaged and regarding on whose behalf he undertook any such activities so as to enable us to conclude that John Viani was engaged in the trade or business of farming at the time petitioners guaranteed their son's equipment loan (and other Bank loans) in 1984 (or at any other time during that year *526 or during 1982, 1983, and 1985). For example, John Viani testified that he "took over" the almond orchard on Kibby Ranch during 1981, the year preceding the year Larry Viani began removing almond trees from that property, and that during 1983 he assisted Larry Viani in the removal of trees from that property. That testimony, however, provides no details of the nature or purpose of the activities John Viani allegedly undertook in "taking over" the almond orchard on Kibby Ranch during 1981 and in assisting his son in the removal of trees from that property during 1983. Nor does it shed any light regarding on whose behalf John Viani was "taking over" the almond orchard and assisting Larry Viani. In addition, when asked to describe what he did as a farmer in 1981, John Viani testified that he "put the people to work and to [sic] supervise -- you know -- I'm supervising everything." He did not explain what work was being done, what work he was supervising, or for whom he was supervising. It is also noteworthy that petitioners did not offer the testimony of any of the people John Viani "put * * * to work and to [sic] supervise". Nor did petitioners explain why that testimony was not *527 presented. We thus assume that the testimony of those individuals would not have been favorable to petitioners' position. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). To illustrate further the general, vague, and/or conclusory nature of the testimony on which petitioners ask us to rely, Lisetta Viani testified that, during the years 1981 through the date of the trial of these cases, John Viani's working activities had remained unchanged and that he was a farmer. She also testified that John Viani repaired an almond huller in 1981 and that, during the years at issue, her husband made night inspections of the irrigation of the almond orchards on the Kibby and Arboleda Ranches when Larry Viani was not present. Larry Viani testified that his father was aware that his son was experiencing problems farming in 1982 through 1984 because John Viani "was out there all the time, too." Mr. Davis testified that John Viani "was always a farmer" and proffered as support for that testimony that John Viani was always in farm clothes and was at Kibby Ranch whenever he *528 visited petitioner there. The testimony of Lisetta Viani, Larry Viani, and Mr. Davis, like that of John Viani, does not provide sufficient detail regarding the nature, purpose, regularity, and continuity of the farming activities in which John Viani was alleged to have been engaged or regarding on whose behalf he undertook any such activities so as to enable us to find that John Viani was in the trade or business of farming at the time petitioners guaranteed their son's equipment loan (and other Bank loans) in 1984 (or at any other time during that year or during 1982, 1983, and 1985). Petitioners also appear to argue that John Viani was in the farming business on November 30, 1984, because he agreed, inter alia, to supervise purchases and expenditures associated with Larry Viani's farming activities as a condition to the Bank's lending additional funds to Larry Viani under the 1985 crop line. Assuming arguendo that John Viani's supervision of purchases and expenditures associated with Larry Viani's farming activities would result in treating John Viani as being engaged in the farming business, no evidence was adduced that John Viani had actually begun such supervision as of November *529 30, 1984, the date on which petitioners guaranteed their son's equipment loan (and other Bank loans), or at any other time during that year. In fact, petitioner testified that he did not begin supervising Larry Viani's farming activities until the end of 1985. Petitioners further contend that John Viani was in the farming business in 1984 because Larry Viani was replanting the almond orchard on Kibby Ranch. On the present record, we are not persuaded that John Viani was in the business of farming merely because Larry Viani cleared and replanted the almond orchard on Kibby Ranch. Although petitioners and Larry Viani testified that Larry Viani agreed to replace the almond orchard on Kibby Ranch as a condition to petitioners' guaranteeing his debts to the Bank, no written agreement was presented to corroborate that testimony. In addition, Larry Viani testified that John Viani and Charles Viani had agreed in 1981 to his renovating the almond orchard on Kibby Ranch. Thus, it appears that a decision was made regarding the replanting of the Kibby Ranch almond orchard prior to the summer or fall of 1982, the time Larry Viani first sought from his parents their guarantee of his debts *530 to the Bank. It is also noteworthy that, at the time Larry Viani began removing almond trees from Kibby Ranch, that land was owned by both petitioner and the Charles Viani Trust. Nothing in the record indicates that Larry Viani was compensated by the Charles Viani Trust for any benefit it would receive from Larry Viani's replanting the almond orchard on Kibby Ranch. Nor does the record explain why Larry Viani would agree to replant the entire almond orchard on Kibby Ranch, rather than only the half of that orchard owned by his father, in exchange for petitioners' guarantee of his loans from the Bank. Based on the entire record, it appears to us that, in replanting the almond orchard on Kibby Ranch, Larry Viani was acting on his own behalf, and not on behalf of his father or the Charles Viani Trust. For example, in the Schedule F attached to Larry and Linda Viani's 1983 joint Federal income tax return, Larry Viani reported income from his sale of old, diseased trees removed from Kibby Ranch. In Schedules F attached to their joint returns for 1984, 1985, 1986, and 1987, Larry Viani claimed depreciation deductions relating to his replanting almond trees during 1984. [22]
*531 Moreover, although petitioners assert that Larry Viani did not lease Kibby Ranch after 1981, as discussed above, Larry and Linda Viani's joint Federal income tax returns for 1983 through 1987 reflect income and deductions arising from Larry Viani's removing and replanting almond trees on Kibby Ranch. We also note that neither the lessors John Viani and Charles Viani nor the lessee Larry Viani gave written notice to terminate the Kibby Ranch lease as would have been required under that lease in order to terminate it. In addition, both John Viani and Larry Viani had represented to the Bank during years pertinent hereto that Larry Viani was going to inherit Kibby Ranch in the near future. Based on that representation, in March 1984, the Bank believed that a loan was going to be executed by Larry Viani, in the name of Viani Farms, in order to cover Larry Viani's costs in replanting the Kibby Ranch almond orchard and that that loan was going to be secured by Larry Viani's ownership interest in Kibby Ranch and the replanted almond orchard thereon. Petitioners further argue that John Viani was in the farming business at the time in 1984 they guaranteed their son's equipment loan because *532 John Viani was a partner in Viani Brothers. [23] *533 Section 1.175-3, Income Tax Regs., provides, inter alia: "A taxpayer is engaged in 'the business of farming' if he is a member of a partnership engaged in the business of farming." [24] However, no Form 1065 for Viani Brothers for 1984 is in the record. We therefore do not know the nature of any activities engaged in by that partnership during that year. Other Forms 1065 in evidence that were filed by Viani Brothers after 1980 state that Viani Brothers was in the business of renting property (farm property and the Save-Mart building), and not in the business of farming. [25] On the instant record, the activities of Viani Brothers cannot be the basis for a conclusion that John Viani was in the business of farming at the time in 1984 petitioners guaranteed the equipment loan (and other loans) to the Bank (or at any other time during 1984 or 1982, 1983, and 1985). Based on the entire record in these cases, we find that petitioners have not established that John Viani was in the trade or business of farming on the date (November 30, 1984) petitioners executed the guarantee for their son's equipment loan (and other loans) to the Bank (or at any other time during 1984 or during 1982, 1983, and 1985). We next focus on petitioners' assertion that John Viani was in the business of renting either on his own or through Viani Brothers on the date in 1984 on which they executed the guarantee of Larry Viani's equipment loan (and other Bank loans) and that that guarantee was proximately related to that business. With respect to petitioners' contention that John Viani was in the rental business *534 on his own on the pertinent date, we note that Schedule E attached to petitioners' 1984 return reflects only deductions claimed for expenses associated with renting farmland and equipment and no income from that claimed activity. Schedules E attached to petitioners' 1982 and 1983 returns also reflect only deductions claimed, and no income, in respect of renting farmland and equipment. Those Schedules E belie petitioners' contention that, at the time in 1984 petitioners executed the guarantee of their son's equipment loan, John Viani was in the business of renting, since such schedules suggest that he did not have the requisite expectation that he would make a profit in that alleged business. See Gajewski v. Commissioner, 723 F.2d 1062, 1065 (2d Cir. 1983), revg. T.C. Memo. 1983-133. With respect to petitioners' assertion that John Viani was in a rental business through Viani Brothers at the time in 1984 they guaranteed their son's equipment loan (and other Bank loans), it is true that the business of a partnership may be the business of its partners. See, e.g., Drobny v. Commissioner, 86 T.C. 1326, 1342 (1986); *535 Brannen v. Commissioner, 78 T.C. 471, 504 (1982), affd. 722 F.2d 695 (11th Cir. 1984). However, as noted above, no Form 1065 for Viani Brothers for 1984 is in the record. Consequently, we are uncertain as to the nature of any activities conducted by that partnership during 1984. While Forms 1065 filed by Viani Brothers for the years 1982, 1983, and 1985 are in evidence, they indicate that the only income from that partnership's rental activities was from the lease of the Save-Martbuilding. Viani Brothers did not report in those returns any income from its lease of farmland or farm equipment. Those Forms 1065 for 1982, 1983, and 1985 suggest that Viani Brothers was not in the business of renting farmland or farm equipment during those years, since there does not appear to have been the requisite expectation of making a profit from that rental activity. See Gajewski v. Commissioner, supra at 1065. Those returns instead suggest that, at the time in 1984 petitioners guaranteed the equipment loan (and other Bank loans), the only rental business in which Viani Brothers, and therefore John *536 Viani, could possibly have been engaged was the lease of the Save-Mart building. Even assuming arguendo that John Viani were in a rental business on his own or through Viani Brothers at the time in 1984 petitioners guaranteed their son's equipment loan (and other Bank loans), on the present record, petitioners have not established a connection between their guarantee of that debt and either John Viani's or Viani Brothers's conduct of that business that would lead us to conclude that their guarantee was proximately related to that business within the meaning of section 166. See United States v. Generes, 405 U.S. at 103-104; Harsha v. United States, 590 F.2d at 886. Based on the entire record, we hold that petitioners are not entitled for 1987 to a business bad debt deduction under section 166 in respect of their payment to the Bank in that year of amounts in settlement of their November 30, 1984 guarantee of their son's equipment loan. The Crop Lines
Petitioners contend that their 1987 payment to the Bank in respect of the 1982/83, 1984, and 1985 crop lines entitles them to a deduction under either section 165 or *537 section 162. In her answering brief, respondent asserts: petitioners raise for the first time on brief the argument that if this was an activity engaged in for profit, that ordinary and necessary business expenses of § 162 should be allowed. It is well settled that issues not raised by the pleadings, but raised for the first time on brief will not be heard by this Court. * * *
Although it is correct that petitioners did not raise the applicability of section 162 in their petitions in these cases, respondent is wrong in asserting that petitioners first raised the applicability of that section in their opening brief. Petitioners in fact raised the application of section 162 in their supplemental trial memorandum. [26]
We may refuse to consider an issue raised by a party for the first time *538 in its trial memorandum where doing so would surprise or prejudice the opposing party. See 508 Clinton Street Corp. v. Commissioner, 89 T.C. 352, 353 n.2 (1987). If a party has not been afforded an adequate opportunity to prepare to address a new issue, consideration of such an issue would prejudice that party's ability to present its case. See Estate of Horvath v. Commissioner, 59 T.C. 551, 555-556 (1973). The absence of evidence in joint exhibits and stipulations of the parties concerning a new issue indicates that a party may be prejudiced by consideration of such an issue where such evidence is different from that relevant to other issues in the case. See Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 735-736 (1981). Respondent's chief complaint to petitioners' raising of the applicability of section 162 is the erroneous allegation that petitioners first argued the applicability of that section in their opening brief. Respondent does not argue that she was surprised or prejudiced by petitioners' raising the applicability of that section. Moreover, as a result of the parties' *539 presenting evidence regarding whether John Viani was involved in a farming business or a rental business during the years at issue, the record in these cases contains stipulations and exhibits relevant to whether John Viani was in a trade or business during the years at issue. Consequently, we shall consider petitioners' contention regarding the applicability of section 162 as well as section 165. In December 1984, John Viani became co-obligated with Larry Viani on the 1982/83, 1984, and 1985 crop lines. In becoming co-obligated,John Viani agreed to be jointly and severally liable for those debts. Under California law, the liability of co-obligorson a joint and several note is presumed equal, absent evidence to the contrary. Gelbach v. Dewey, 286 P. 1062, 1063 (Cal. Dist. Ct. App. 1930). Moreover, "a party to a joint, or joint and several obligation, who satisfies more than his share of the claim against all, may require a proportionate contribution from all the parties joined with him." Cal. Civ. Code sec. 1432 (West 1982). [27] The record in these cases does not establish that John Viani and Larry Viani intended to share their obligation to pay *540 the crop lines for which they were co-obligors other than equally. As a result of his becoming co-obligated on his son's crop lines, John Viani was required by the Bank to make a payment in 1987 in settlement of the entire amount outstanding under those crop loans. Nevertheless, since John Viani satisfied more than his one-half share of those loans, he could have required a proportionate contribution from Larry Viani, the other co-obligor. With respect to the one-half share of the settlement payment in respect of the 1982/83, 1984, and 1985 crop lines for which John Viani could not have required a contribution from Larry Viani, John Viani was merely paying his own debt when he made that payment to the Bank. Consequently, that payment does not entitle petitioners to a bad debt deduction under section 166, a loss under section 165, or a trade or business deduction under section 162. Cf. Estate of Schwehm v. Commissioner, 17 T.C. 1435, 1443 (1952) *541 (no deduction under predecessors to sections 166 and 165); Lang v. Commissioner, 32 B.T.A. 522, 526-527 (1935) (no deduction under predecessor to section 166). With respect to the one-half share of the settlement payment for which John Viani could have required a contribution from Larry Viani, John Viani was acting as a guarantor of that one-halfshare pursuant to the guarantee executed by him and his wife on November 30, 1984. In this connection, in late December 1984, when petitioner became co-obligated on his son's 1982/83, 1984, and 1985 crop lines with the Bank, the loan guarantee he and Lisetta Viani had executed on November 30, 1984, which covered, inter alia, those crop lines and which superseded all of petitioners' prior guarantees of their son's debts to the Bank, remained in effect. Thus, petitioners' entitlement to a deduction relating to the settlement payment in respect of the one-half portion of the crop loans for which John Viani could have required a contribution from Larry Viani and as to which petitioners were guarantors hinges on petitioners' right to deduct that payment as a bad debt under section 166. It does not depend on section *542 162 or 165. See Putnam v. Commissioner, 352 U.S. at 87-88 (loss attributable to guarantor's payment of debt of third party must "be regarded as a bad debt loss, deductible as such or not at all"). Based on the entire record, for the reasons set forth above in support of our denial of petitioners' claim for a business bad debt deduction in respect of their payment of amounts in settlement of their guarantee of their son's equipment loan, we hold that petitioners are not entitled for 1987 to a business bad debt deduction under section 166 in respect of their payment to the Bank in that year of amounts in settlement of the one-half portion of the 1982/83, 1984, and 1985 crop lines for which John Viani could have required Larry Viani to make a contribution and as to which petitioners were guarantors. * * * In summary, based on the entire record in these cases, we hold that petitioners are not entitled to any deduction relating to their payment to the Bank in 1987 to settle (1) the equipment loan signed by Larry Viani and guaranteed by petitioners or (2) the 1982/83, 1984, and 1985 crop loans signed by John Viani and Larry Viani as co-obligors and guaranteed *543 by petitioners. [28]
Petitioners' Claim for Additional Depreciation Relating to the Kibby Ranch Almond Orchard and Certain Farm Equipment
In their 1987 return, petitioners claimed, for purposes of depreciation, a basis of $ 112,500 for the almond trees located on Kibby Ranch. On brief, petitioners argue that in the event we were to determine that they are not entitled to a deduction for 1987 in the amount they had originally claimed as a business bad debt deduction in their return for that year, *544 they "should be allowed to reconsider * * * [their] allocation to the trees". Respondent argues that petitioners have not established a basis in the almond trees in excess of $ 90,000, the basis determined by her and reflected in the 1987 notice. In arguing that they are entitled to a basis for the almond trees in excess of $ 90,000, petitioners do not specifically state the amount of that higher basis to which they believe they are entitled. Nevertheless, to support their claim for a higher basis, petitioners rely on the testimony of Mr. Asai, their expert, and a report, titled "Almond Production Costs, Merced County 1986" (report), that he helped prepare. Mr. Asai testified that the "cumulative cost" over two to three years to cultivate an almond orchard is in the range of $ 2,000 to $ 4,000 per acre, "a lot of which is contingent upon what investment costs and depreciation costs the farmer has." Moreover, he testified that, based on certain given conditions, including those relating to the method of land preparation, the type of irrigation system used, and the means of financing the planting and maintenance of an orchard, the accumulated net cost associated with planting and *545 maintaining an almond orchard over a five-year period is over $ 8,100 per acre. [29] Relying on the conclusions of Mr. Asai that costs over two to three years to cultivate an almond orchard are in the range of $ 2,000 to $ 4,000 per acre and that the accumulated net cost associated with planting and maintaining an almond orchard over a five-year period is over $ 8,100 per acre, petitioners presumably would have us determine that their basis in the almond orchard on Kibby Ranch should be between approximately $ 180,000 (90 acres times $ 2,000) and $ 729,000 (90 acres times $ 8,100 per acre). We evaluate the opinion of petitioners' expert in light of his qualifications and all other evidence of value. See Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); *546 Parker v. Commissioner, 86 T.C. 547, 561 (1986). The persuasiveness of an expert's conclusion depends largely upon the disclosed facts on which it is based. See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244. Even if only one party proffers the opinion of an expert, such as is the case here, we are not required to accord that opinion total or even partial acceptance. Tripp v. Commissioner, supra at 434-435; Estate of Gilford v. Commissioner, 88 T.C. 38, 56 (1987). Where the opposing party clearly shows to our satisfaction a significant error in that opinion, appropriate adjustments will be made. Estate of Gilford v. Commissioner, supra.
Mr. Asai admitted at the trial of these cases that he had not visited the almond orchard at Kibby Ranch and had no particular knowledge "whatsoever about * * * [the] orchards, * * * [the] trees, * * * [the] land [at Kibby Ranch]." Petitioners have not established that the assumptions underlying the report, including assumptions *547 regarding the method of land preparation, the type of irrigation system used, and the means of financing the planting and maintenance of an orchard, and the assumptions Mr. Asai made regarding "investment costs and depreciation costs the farmer has" are analogous to the actual experiences of Larry Viani in replanting the Kibby Ranch almond orchard. On the instant record, we will not rely on the report in determining petitioners' basis in the Kibby Ranch almond orchard. Petitioners also proffered testimony from Larry Viani to the effect that he invested approximately $ 160,000 to replant the almond orchard at Kibby Ranch. However, no records were produced to corroborate that testimony. Moreover, prior to the time the Bank required John Viani to execute the almond orchard development loan in late November 1984, Larry Viani told the Bank that he had invested only $ 90,000 in replanting that orchard. We find that Larry Viani's uncorroborated testimony that he spent $ 160,000 to replant the Kibby Ranch almond orchard lacks credibility. Consequently, we do not rely on it. On the instant record, petitioners failed to establish a basis for the Kibby Ranch almond orchard in excess of *548 $ 90,000, the basis determined by respondent and reflected in the 1987 notice. We therefore sustain respondent's determination that the basis for that orchard is $ 90,000. Petitioners also contend that they should be entitled to a basis in excess of the $ 65,500 basis reflected in their 1987 Schedule F for the farm equipment described in the settlement document that John Viani acquired after he settled the debts owed the Bank. In the 1987 notice, respondent did not make an adjustment to the depreciation deduction petitioners claimed for that equipment. Although petitioners do not state the amount of additional basis that they are claiming for the equipment in question, they apparently rely on an appraisal prepared by the Bank (Bank's appraisal) that reflected a value for the farm equipment, as of July 25, 1986, of between $ 118,000 and $ 119,000. The appraiser who prepared the Bank's appraisal was not presented as a witness in these cases. Consequently, we are unable to judge his credentials and methods of valuation in deciding whether to rely on the values he assigned the farm equipment reflected in the Bank's appraisal. It is also noteworthy that, in lieu of receiving that *549 equipment, the Bank agreed to accept $ 68,500 in cash. Petitioners have not established that their basis in the farm equipment should be increased above the amount determined by respondent in the 1987 notice, which is the amount they claimed in their 1987 Schedule F. We therefore sustain respondent's determination of the basis for that equipment. Miscellaneous Issues
Petitioners presented no evidence and make no argument that they should be entitled to deduct legal fees for 1987, 1988, and 1989 in the amounts of $ 11,000, $ 6,548, and $ 1,995, respectively, that they claimed in their returns for those years. On the instant record, petitioners have failed to carry their burden of establishing that they are entitled to those claimed deductions. We therefore sustain respondent's determination disallowing those deductions. In Schedules F attached to the 1987, 1988, and 1989 returns, petitioners claimed interest deductions in the respective amounts of $ 35,272, $ 75,479, and $ 81,988. Respondent disallowed those deductions in their entirety except for 1988 in respect of which respondent disallowed only $ 73,960 of the total amount claimed. The ground stated in the notices *550 of deficiency for respondent's determination is that the interest expenses in question should be deducted as itemized personal interest deductions, subject to the percentage limitations under section 163(h)(5). Petitioners presented no evidence and make no argument that respondent's determination is wrong. On the instant record, petitioners have failed to carry their burden of establishing their entitlement to the interest deductions claimed in their 1987, 1988, and 1989 returns. We therefore sustain respondent's determination that the $ 35,272, $ 73,960, and $ 81,988 in claimed interest deductions for 1987, 1988, and 1989, respectively, are itemized personal interest deductions, subject to the percentage limitations of section 163(h)(5). Additions to Tax and Accuracy-Related Penalty -- Sections 6661 and 6662
Respondent determined that petitioners are liable for the additions to tax under section 6661 for 1984 through 1988 [30] and for the accuracy-related penalty under section 6662 for 1989 as a result of a substantial understatement of income tax for each of those years. [31] An understatement exists where the amount of tax shown on the taxpayer's return is less than the *551 amount required to be shown in his or her return. Sec. 6661(b)(2)(A); see also sec. 6662(d)(2)(A). In the case of individuals, an understatement is substantial where it exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown on the taxpayer's return. Sec. 6661(b)(1)(A); see also sec. 6662(d)(1)(A). Excepting items attributable to tax shelters, the amount of the understatement is reduced by items with respect to which the taxpayer had substantial authority for his or her position or for which relevant facts affecting the tax treatment in the return were adequately disclosed. Sec. 6661(b)(2)(B); see also sec. 6662(d)(2)(B). *552 Section 6661(c) allows respondent to waive all or part of the addition to tax under section 6661 upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. The regulations under section 6661 provide: In making a determination regarding waiver of the penalty under section 6661, the most important factor * * * will be the extent of the taxpayer's effort to assess the taxpayer's proper tax liability under the law. * * * In addition, circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer. * * * Reliance on an information return or on the advice of a professional (such as an appraiser, an attorney, or an accountant) would not necessarily constitute a showing of reasonable cause and good faith. Similarly, reliance on facts that, unknown to the taxpayer, are incorrect would not necessarily constitute a showing of reasonable cause and good faith. Reliance on an information return, professional advice, or other facts, however, would constitute a showing of reasonable *553 cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. * * * [Sec. 1.6661-6(b), Income Tax Regs.]
For 1989, section 6664(c)(1) provides that the accuracy-related penalty under section 6662 does not apply "to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Section 1.6664-4(b), Income Tax Regs., establishes a standard for reasonable cause and good faith that is similar to that expressed in section 1.6661-6(b), Income Tax Regs.
In addressing the applicability of sections 6661 and 6662, both petitioners and respondent focus primarily on whether petitioners had substantial authority for the positions reflected in their returns for 1984 through 1989 and whether the disclosure statement attached to the 1987 return was an adequate disclosure for purposes of section 6661. Petitioners also argue that respondent should have waived the addition to tax under section 6661. In reporting the positions reflected in the tax returns they filed for 1984 through 1989, petitioners relied on their accountant Mr. *554 Davis and their attorney Mr. Lawrence. All the returns in question were prepared by someone in the office of Mr. Davis and were reviewed and signed by him as return preparer. Although both John Viani, who had a limited education, and his wife Lisetta Viani reviewed their returns after Mr. Davis had them prepared and before they signed them, petitioners did not fully understand their returns for the years at issue. Petitioners, who were unfamiliar with the tax laws, were unable to determine if there were any mistakes in the returns prepared by Mr. Davis' office. In addition, it is significant that, in determining whether petitioners could claim the bad debt deduction reflected in the 1987 return, Mr. Davis requested an opinion from Mr. Lawrence, petitioners' counsel herein. In a letter addressed to petitioners, a copy of which Mr. Davis received, Mr. Lawrence concluded that "John and Lisetta Viani in the opinion of this office have a business bad debt in an amount equal to the payment to [the] Bank * * * during 1987 representing a worthless debt between John and Larry Viani." Based on the entire record in these cases, we find that petitioners reasonably relied on the advice of *555 Mr. Davis and Mr. Lawrence in taking their return positions and acted in good faith in taking those positions. Turning to the applicability of section 6661, we note that an appeal in the instant cases normally would be to the United States Court of Appeals for the Ninth Circuit. In Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991), affg. in part and revg. in part per curiam an Oral Opinion of this Court, that Court held that, where a taxpayer's reliance on an adviser was "reasonable" and "in good faith under all the circumstances", the Commissioner should waive the addition to tax under section 6661. On the instant record, we have found that petitioners' reliance on Mr. Davis and Mr. Lawrence in taking their return positions was reasonable and that they acted in good faith in taking those positions. Accordingly, we conclude that the standard under the Vorsheck case for a waiver of the addition to tax under section 6661 has been met for each of the years at issue in respect of which respondent determined that such addition to tax is applicable. [32] We therefore refuse to sustain respondent's determination that such additions apply to *556 those years. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971). Turning to the applicability of section 6662, we have found on the present record that petitioners reasonably relied on the advice of Mr. Davis and Mr. Lawrence in taking their return positions and that they acted in good faith in taking those positions. Consequently, we hold that, pursuant to section 6664(c)(1), the accuracy-related penalty under section 6662 does not apply to any underpayment for 1989. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners failed to file with the Court, and presumably failed to serve on respondent, any response to respondent's request for admissions. Respondent does not argue that, as a consequence of petitioners' failure, the facts alleged in her request for admissions are deemed admitted. Instead, respondent relies on the testimony and exhibits presented at the trial of these cases to establish the facts in support of her contentions. Under these circumstances, we shall not deem the facts alleged in respondent's request for admissions to be admitted. The presentation of the merits of the instant cases was subserved, and evidently respondent does not believe she has been prejudiced in prosecuting these cases, by not deeming those alleged facts to be admitted. See Rule 91(f).↩
3. While not entirely clear from the record, it appears that the lease of farm property included both farmland and farm equipment.↩
4. No Form 1065 for Viani Brothers for 1984 is in the record.↩
5. It is unclear whether that rental payment related to Larry Viani's use of Kibby Ranch for 1981 and/or 1980.↩
6. It is unclear whether that rental payment related to Larry Viani's use of Arboleda Ranch for 1981 and/or 1980.↩
7. Amounts borrowed pursuant to loan No. 684 were borrowed after Larry Viani had incurred farming expenses during 1982 and 1983. Although the record is unclear on this point, presumably amounts borrowed pursuant to loan No. 684 were used to refinance amounts Larry Viani had previously borrowed from the Bank for the purpose of paying expenses incurred while he farmed during those years.↩
8. Amounts borrowed pursuant to loan No. 906 were borrowed after Larry Viani had incurred farming expenses during 1984. Although the record is unclear on this point, presumably amounts borrowed pursuant to loan No. 906 were used to refinance amounts Larry Viani had previously borrowed from the Bank for the purpose of paying expenses incurred while he farmed during that year.↩
9. No 1982 Federal income tax return filed by Larry Viani, either individually or jointly with his wife Linda Viani, is in the record.↩
10. The almond orchard development loan was used to reduce Larry Viani's outstanding debt to the Bank in the amount of $ 90,000.↩
11. The settlement document provided for the payment by petitioners to the Bank of $ 844,525 in cash ($ 776,025 + $ 68,500) or the transfer to the Bank of title to the three parcels of real estate and the equipment described in that document. Although the record does not explain the difference between the $ 844,525 cash payment provided for in the settlement document and the $ 883,600 amount paid to the Bank on May 29, 1987, presumably the difference is attributable to interest accruing from the date of the execution of the settlement document to the date the $ 883,600 was paid.↩
12. The record does not explain the $ 1,000 discrepancy between the total amount (i.e., $ 882,600) petitioners borrowed from Hancock Money, Federal Land Bank, and Wells Fargo Bank and the total amount (i.e., $ 883,600) they paid to the Bank.↩
13. Petitioners did not file either a Form 1045 or a Form 1040X for 1983.↩
14. Petitioners' net farm loss for 1987 was carried back to 1986, 1985, and 1984 and carried forward to 1988 and 1989. The carryback of the claimed 1987 loss to 1984 and 1985 permitted petitioners to claim larger investment tax credits for 1981 and 1982. The carryback of the claimed 1987 loss to 1984 and 1985 and the claim for larger investment tax credits for 1981 and 1982 were reflected in the Forms 1045 filed by petitioners for those years.↩
15. The parties incorrectly stipulated that petitioners claimed a business bad deduction in the amount of $ 667,600.↩
16. The parties stipulated that petitioners allocated $ 68,500 of the $ 883,600 paid by them to the Bank to that equipment. That stipulated amount is $ 3,000 greater than the basis for the equipment reflected in petitioners' 1987 tax return; there is no explanation in the record for this discrepancy.↩
17. Petitioners challenge the validity of sec. 1.166-9, Income Tax Regs., which relates to guarantees of both business and nonbusiness debts that become worthless. We need not address the validity of that regulation as it relates to guarantees of nonbusiness debts in light of the parties' agreement that petitioners are not entitled to nonbusiness bad debt treatment in these cases. Nor do we have to reach the validity of sec. 1.166-9,Income Tax Regs.↩, as it relates to guarantees of business debts in light of our disposition below of the business bad debt issue presented by the parties.
18. Petitioners do not contend that their 1987 payment to the Bank in respect of the almond orchard development loan on which John Viani was the sole debtor entitles them to a deduction under the Internal Revenue Code.↩
19. Petitioners' November 30, 1984 guarantee superseded their prior guarantees of their son's debts to the Bank.↩
20. We discuss below the cost of removing and replanting the almond orchard on Kibby Ranch.↩
21. It is noteworthy that no Schedules F were attached to petitioners' 1982, 1983, and 1985 returns, and each of those returns indicated that John Viani was retired.↩
22. Larry Viani paid the costs associated with the removal and replanting of almond trees on Kibby Ranch. In the joint returns filed by Larry Viani and his wife for 1983 through 1987, Larry Viani claimed deductions relating to farming. (No return for Larry Viani for 1982 is in the record.) Although it is unclear from the record, we presume that Larry Viani included as part of the total farming deductions claimed in the joint returns he filed for 1983 and 1984 deductions relating to expenses he incurred during those years in removing and replanting almond trees on Kibby Ranch.↩
23. Petitioners contend for the first time on brief that (1) Larry Viani and John Viani either operated Larry Viani's farming operations as an actual partnership or formed an "inadvertent partnership" to operate those farming operations, and (2) a loss would arise from John Viani's having abandoned his partnership interest. Because these issues were raised for the first time on brief, respondent was not given adequate notice to address the inherent factual questions involved in determining whether John Viani and Larry Viani jointly operated Larry Viani's farming operations as a partnership and whether, if John Viani held such a partnership interest, he subsequently abandoned it. We therefore will not consider those contentions of petitioners. See Maxcy v. Commissioner, 59 T.C. 716, 728 (1973); Shomaker v. Commissioner, 38 T.C. 192, 201 (1962). We note, however, that Larry Viani testified that Viani Farms, the name under which Larry Viani conducted his farming operation, was not a partnership. Moreover, in a question in the bankruptcy petition that Larry Viani and his wife Linda filed in 1989, Larry Viani was required to list partners, joint venturers, and other associates with whom he conducted business during the six years immediately preceding the filing of that petition. Larry Viani did not list therein his father John Viani or his mother Lisetta Viani as either a partner, joint venturer, or other associate of his and did not describe Viani Farms as being a partnership during that six-year period.↩
24. For purposes of determining a taxpayer's gross income from farming under sec. 61, sec. 1.175-3, Income Tax Regs., applies. Sec. 1.61-4(d), Income Tax Regs.↩
25. The returns in evidence for Viani Brothers reflect minimal amounts of income that were received from the Tomato Trust and that appear to be related to that partnership's farming tomatoes during years prior to 1981.↩
26. The trial of these cases, which had been continued twice, occurred at the Court's trial session that began on Sept. 20, 1993. Petitioners submitted their supplemental trial memorandum to this Court on Sept. 16, 1993.↩
27. All references to Cal. Civ. Code are to sections of the California Civil Code in effect for the years at issue.↩
28. In light of our holding, we sustain respondent's determinations regarding (1) the disallowance of petitioners' carryforward and carryback of an alleged net operating loss arising from their having claimed a bad debt deduction for 1987, (2) the disallowance of petitioners' claim for increased investment tax credits as a result of that carryback, and (3) the Social Security income petitioners were required to report for 1987, 1988, and 1989 and petitioners' liability for additional self-employment tax for those years.↩
29. Newly planted almond trees generally do not become productive until five years after their planting.↩
30. Respondent did not determine any additions to tax under sec. 6661 for 1981 and 1982.↩
31. The notice of deficiency for 1989 reflects that the accuracy-related penalty was applied because "a portion of the underpayment of tax required to be shown on the [1989 tax] return is attributable to one or more of (1) negligence or disregard of rules or regulations, (2) a substantial understatement of income tax, or (3) any substantial valuation overstatement." On brief, respondent addresses the application of the accuracy-related penalty only in the context of a substantial understatement of income tax. We therefore address the application of the accuracy-related penalty only in that context.↩
32. We infer that petitioners requested waivers of the addition to tax under sec. 6661 given that, through the course of this litigation, they have attempted to establish that they acted reasonably and in good faith. See Mailman v. Commissioner, 91 T.C. 1079, 1084↩ (1988).